**OTTINGER et al. v. UNITED STATES.***

No. 49102.

United States Court of Claims.
July 15, 1952.

Before JONES, Chief Judge, and LIT-TLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

The plaintiffs are a partnership engaged in the construction business. They made four separate contracts with the United States, which acted through the Army Engineers, for constructing levee work near Tulsa, Oklahoma. The dates of the contracts were September 22 and December 6, 1943, and January 3 and February 29, 1944.

Work under the first contract was commenced about October 6, 1943, by the preparation of the site for the reception of the construction equipment. Only a few workmen were used on this preparatory work.

Shortly before the commencement of work on the contracts involved in this suit, the plaintiffs had performed another contract for the Government in the Tulsa area. They had operated on an open shop basis, and three different labor organizations had made written protests to the Tulsa office of the United States Employment Service, requesting that it refer no workmen to the plaintiff because of the existence of a labor dispute on the plaintiff's job. The other Government contractors working in the area had closed shop agreements with the unions. The United States Employment Service, apparently pursuant to the protests of the unions, refused to honor the plaintiffs' requests for the referral of workmen to that job. But the plaintiffs succeeded in completing it and it is not involved in this suit.

On October 6, when work was commenced on the first of the four contracts herein involved, the alliance of Tulsa Building Trades, representing a number of building trades unions affiliated with the American Federation of Labor notified the Tulsa office of the United States Employment Service that its affiliated crafts were having labor difficulties with the plaintiffs, and, on October 14 notified that office that the job was being picketed. At first the plaintiffs were able by hiring applicants "at the gate" to obtain the small force that they needed. There was no law or policy against their

Walter D. Hanson, Oklahoma City, Okl., for the plaintiff. Watters, Cowen & Donovan, Abner H. Ferguson, Washington, D. C., and Rittenhouse, Hanson & Evans, Oklahoma City, Okl., were on the briefs.

Gaines V. Palmes, Washington, D. C., with whom was Asst. Atty. Gen. Holmes Baldridge, for the defendant.

doing so. But on October 9 the plaintiffs requested the Employment Service to refer seven common laborers to their job. They were told that no labor would be referred to them until it was determined that a labor dispute did not exist, or if one did exist, that it had been settled.

The United States Employment Service was an arm of the War Manpower Commission, which had its central office in Washington, D. C. An Area Director was located in Tulsa, and above him was a Regional Director in Kansas City whose Region covered four States. The Regional Director requested the Director of the United States Conciliation Service to send a conciliator to try to get the dispute settled. A conciliator came but he made no headway. The unions would consider nothing but a closed shop and the employer insisted upon an open shop. There was no other issue between them.

Shortly before November 7 the plaintiffs asked the labor unions to furnish labor for the plaintiffs' job. The plaintiffs knew, of course, that the unions would send only union members, if members were available. A discussion followed and an oral agreement was reached that the union would furnish men for the job but the plaintiffs would not require any one to join the union and would still operate an open shop. The unions thereupon withdrew protests which they had filed at the Employment Service Office, and withdrew their pickets. The union furnished men and the job proceeded until December 1.

On December 1 the unions again gave notice to the Employment Service that there was a labor dispute at the plaintiffs' job. They said that the plaintiffs had failed to live up to their oral agreement which was, the unions said, that the plaintiffs would put the job on a closed shop basis by December 1. By that time, of a force of 173 men on the job, only ten were not union members. On December 6 the unions called a strike, and all but twenty men struck. The Employment Service thereafter refused to refer men to the job. It also refused to issue statements of availability to the strikers, without which statements they could not get other jobs. Thus

it put pressure on both sides to resolve their differences.

The Chief of Engineers, whose agency had charge of the contract, protested against the policy of the Employment Service of refusing to refer labor to the job, since lack of labor threatened to delay completion of the work on time. Conciliators made further unsuccessful efforts to resolve the disagreement. The Employment Service persisted in its policy. On August 23, 1944, the plaintiffs made a formal appeal from the action of the Area Director to the Regional Director of the War Manpower Commission. The Regional Director took the vote of his Regional War Manpower Committee made up of representatives of employers and unions and only one vote favored the referral of labor to the plaintiffs. Thereupon the Regional Director denied the appeal.

The plaintiffs, after the strike was called on December 6, 1943, received no referrals from the Employment Service and had to recruit their forces without that assistance. They finally completed the levee contracts some time after the agreed completion date. They claim to have been damaged by the refusal of referrals, but, because only the issue of liability was tried in the present proceeding, they presented no evidence of the fact and the amount of their alleged damage.

This case was before us on the Government's demurrer to the plaintiffs' petition. The asserted ground for the demurrer was that the plaintiffs' alleged damage resulted from acts of the United States in its sovereign capacity, and not in its contractual capacity, and therefore gave rise to no cause of action. In our opinion rendered on March 6, 1950, 88 F.Supp. 881, 883, 116 Ct.Cl. 282 overruling the demurrer, we said:

"We think that when agents of the Government, without justification in statute, executive order, administrative discretion or otherwise, engage in conduct which is a violation of an express or implied provision of a Government contract, the mantle of sovereignty does not give the Government immunity from suit. It needs no such

immunity in order to be able to go on governing wisely and as circumstances require without being hampered by its outstanding contracts. We think that to treat every act of a Government agent, done in the name of the Government, as an act of sovereignty within the meaning of the doctrine here under discussion would be a retreat, without reason, from the purpose of the statute permitting citizens to sue the United States for breach of contract."

We were there discussing the allegations of the plaintiffs' petition which, for the purposes of the demurrer we assumed to be true.

Now that a trial has been had, and the full facts have been developed, the matter has a different appearance. The refusal to refer labor to an employer who was involved in a labor dispute turns out to have been a Nation-wide policy applied to all employers so situated.

Executive Order No. 9139 dated April 18, 1942, established the War Manpower Commission. The President stated that he was acting pursuant to the Constitution and the Statutes, including the First War Powers Act, 50 U.S.C.A.Appendix, § 601 et seq., and as Commander-in-Chief of the Army and Navy, for the purpose of assuring the most effective mobilization and utilization of the national manpower. The Order provided that the Chairman of the Commission, after consultation with the members, should

"* * * formulate plans and programs and establish basic national policies to assure the most effective mobilization of the Nation's manpower in the prosecution of the war; and issue such policy and operating directives as may be necessary thereto."

The United States Employment Service Manual issued by the War Manpower Commission, dated October 13, 1943, said:

"3440 *Policy Regarding Referrals to Jobs Vacant Because of a Labor Dispute*: Local offices of the United States Employment Service shall make no referral, except in accordance with specific instructions to do so from the Regional Manpower Director, which will aid directly or indirectly in filling a job (a) which is vacant because the former occupant is on strike or is being locked out in the course of a labor dispute or (b) the filling of which is an issue in a labor dispute.

"The Regional Manpower Director may direct that referrals are to be made to such jobs if, after taking the following steps, he determines that the making of such referrals is in the best interest of the war effort:

"1. The Regional Manpower Director will request from a representative of the Government agency concerned with the adjustment of the labor dispute a statement as to whether that agency believes that the making of referrals to such jobs will interfere with negotiations or delay progress in the settlement of the dispute.

"2. The Regional Manpower Director will submit to his Management-Labor Committee the information secured from the Government agency and other available information, and request the advice of the Management-Labor Committee as to the action which should be taken.

"3. The Regional Manpower Director, after considering all the advice so secured, will determine whether the making of referrals is in the best interest of the war effort, and issue the proper instructions to the local offices concerned.

"3441 *Policy Concerning Granting Statements of Availability to, or referring Workers Involved in a Labor Dispute:* No Statement of Availability shall be issued to, and no referral shall be made of, a worker who is not working because he is participating in or interested in a strike or a lockout in the establishment or department thereof in which he is employed, except in accordance with specific instructions to do so from the Regional Manpower Director.

*    *    *    *    *    *

"3442 *Interpretation:* The term "labor dispute" shall include any controversy concerning terms or conditions of employment or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment regardless of whether or not the disputants stand in the proximate relation of employer and employee. The term includes any controversy between employers, or their representatives, and workers, or their representatives; or between groups of workers or their representatives, concerning any of the following:

"1. Negotiating, fixing, maintaining, changing, or arranging terms or conditions of employment;

"2. The employment, non-employment, or tenure of employment of any individual or group of individuals;

"3. The right of individuals or groups of individuals to be recognized as the representatives or bargaining agents of employers or workers."

The definition of the term "labor dispute" in this manual was an orthodox definition. The first sentence in the definition is copied verbatim from the Act of March 23, 1932, c. 90, § 13, 47 Stat. 73, 29 U.S.C.A. § 113(c), the Norris-LaGuardia Act. The same definition, with the addition of one word, was contained in the Act of July 5, 1935, c. 372, § 2, 49 Stat. 450, 29 U.S.C.A. § 152(9), the original National Labor Relations Act. The amendments to the National Labor Relations Act made by the Taft-Hartley Act of June 23, 1947, c. 20, Title I, § 101, 61 Stat. 137, 29 U.S.C.A. § 152(9) left this definition unchanged. The Commission, therefore, in defining the term "labor dispute" to include a controversy between an employer and persons such as union organizers who were not his employees and who did not represent his employees was defining the expression as Congress then defined it and still defines it. The rest of the Commission's interpretation of the term adds nothing which is inconsistent with the Congressional definition.

The Commission's Manual, as we have seen, directed all of its local Employment Service offices throughout the country to refrain from referring applicants for jobs to an employer who was involved in a labor dispute, "except in accordance with specific instructions to do so from the Regional Manpower Director." That official was instructed to obtain certain information from a representative of whatever other Government agency might be attempting to resolve the dispute, take the advice of his Regional Management-Labor Committee, made up of representatives of both employers and employees, and then make his decision as to whether workmen should be referred to the employer or not. In the instant case the advice of the Committee, with only one dissenting vote, was that labor should not be referred, and the Regional Director so decided.

What the local officials in Tulsa, of the War Manpower Commission did, then, was to carry out a national policy which was, in fact, applied throughout the United States. The plaintiffs' attack, then, must be upon the rules of the War Manpower Commission, and not upon the activities of its local agents. Were, then, those rules so arbitrary and unreasonable as to be illegal? If we were to so conclude, there would be the further question whether an illegal act of the sovereign, which interferes with the performance of his contract by one who has contracted with the sovereign, makes the sovereign liable to the contractor as for a breach of an implied term of the contract.

We think the rule laid down by the War Manpower Commission was not so arbitrary and unreasonable as to be illegal. In the days when employment agencies were private enterprises, an agency which, without warning, referred an applicant to a job where there was a strike or picketing, would have lost its patronage. Many workmen, though they needed jobs, would not engage in strike-breaking, and would not cross a picket line. There was class solidarity, or physical fear, or both, in their attitudes. They did not, and usually could not, investigate the merits of the dispute.

When the Government went into the business of running employment agencies,

it had, of course, the same problem. National policy, beginning at least in 1932 was to encourage unionization of labor. In that year, in the Norris-LaGuardia Act, Congress in effect gave a vote of no-confidence in the capacity of the Federal Courts to wisely decide cases involving labor disputes. It abolished their jurisdiction to grant injunctions in such cases, except under narrowly defined conditions which almost never occurred. Three years later Congress in the National Labor Relations Act gave powerful assistance to unions in their organizing efforts. In view of this attitude, embodied in Acts of Congress, it was not unnatural that when the United States went into the employment agency business, it decided that it would keep hands off in labor dispute cases. The plaintiffs, as employers, were still free to recruit labor if they could find it. They were not, as they allege in their petition, required to get their labor through the United States Employment Service. They were, therefore, by the policy of which they complain, merely denied the assistance of an employment agency conducted by the Government.

█ █ The October affair was a "labor dispute" within the meaning of the War Manpower Commission's manual and the statutes cited above. The fact that the unions which were demanding that the plaintiffs unionize the job may have had no members among the plaintiffs' employees did not prevent it from being a labor dispute. The statutes and the manual say that "regardless of whether or not the disputants stand in the proximate relation of employer and employee", the controversy is a labor dispute. The December controversy was clearly a labor dispute by any possible definition. By that time some eighty-five percent of the plaintiffs' employees were union members, and practically all of them struck.

█ The plaintiffs suggest that it would have been illegal for them to yield to the unions' demands for a closed shop, in the absence of a National Labor Relations Board election and a certification by the Board that the unions were the chosen representatives of the employees. The plaintiffs are mistaken in this regard. Section

8(3) of the National Labor Relations Act, 29 U.S.C.A. § 158(3) forbade an employer to discriminate in regard to hire or tenure of employment because of membership or nonmembership in a union, but it contained a proviso which permitted an employer to make a closed shop agreement with a union "if such labor organization is the representative of the employees as provided in Section 9(a), 29 U.S.C.A. § 159(a)". The latter Section provides that representatives selected by the majority of employees shall be the exclusive representatives of all the employees, and does not require a Board election or certification to give them that legal status.

At the time of the December controversy and thereafter to the end of the contract work the unions had a large majority of the plaintiffs' employees. The plaintiffs knew this, because under the November 9 agreement they had used the unions as an employment agency to recruit their employees. There was, then, nothing in the National Labor Relations Act which forbade the plaintiffs to make the agreement which the unions desired, if the plaintiffs had been willing to make it.

█ █ We have found that the intent of the plaintiffs in the agreement of November 9 was what the plaintiffs claim it was, viz., that they would hire their employees through the union, but would not put the job on a closed shop basis, i. e. require their old employees to join the union, or the new employees to stay in the union. But the agreement was oral and may have been misunderstood by the union representatives. At any rate, whether or not the December strike was in intentional violation of the agreement, it was a strike and a labor dispute.

█ The October controversy stands on a different footing. At that time the union, so far as appears, had no members among the plaintiffs' employees. If the National Labor Relations Act was applicable, it would have been an unfair labor practice for the plaintiffs to make a closed shop agreement with unions which did not represent their employees, and thus coerce their employees into joining the unions. At that time, however, the National Labor Relations Board

204

did not assert jurisdiction in the construction industry, except in unusual cases. The basis for Federal jurisdiction under the interstate commerce clause of the Constitution would have been at least doubtful, when the job consisted largely of moving earth to build a levee. There is nothing in the record to indicate that the National Labor Relations Board asserted or contemplated asserting jurisdiction over the plaintiffs' operations. Whether or not it would have been lawful for the plaintiffs to have yielded to the unions' demands in October depended, then, on the law of Oklahoma. We are not advised of any law of that state at that time making a closed shop illegal.

Our conclusion is, then, that the War Manpower Commission's general policy of refusing to furnish its services as an employment agency to employers who were involved in a labor dispute was not so arbitrary and unreasonable as to render it illegal, and remove it from the category of sovereign acts which do not constitute breaches of implied terms in the contracts of the United States. We of course express no opinion of the wisdom of the policy in general or in wartime conditions when labor is scarce and the timely completion of jobs is urgent.

The plaintiffs' petition will be dismissed. It is so ordered.

JONES, Chief Judge, and HOWELL, WHITAKER and LITTLETON, Judges, concur.

Whitaker, J., dissented.

---

\* Motion for new trial pending.