**WAH CHANG CORPORATION**
v.
**UNITED STATES.**
No. 124–55.

United States Court of Claims.
Oct. 5, 1960.

Thornton C. Land, New York City, Sumner Ford, Stoddard B. Colby, Charles T. Hall, and Breed, Abbott & Morgan, New York City, on the brief, for plaintiff.

Howard O. Sigmond, Washington, D. C., with whom was Perry W. Morton, Asst. Atty. Gen., for defendant.

JONES, Chief Judge.

This action is brought pursuant to Private Law No. 997, 83d Cong., 2d Sess., c. 1251, 68 Stat. A288 (1954), which provides:

"That, notwithstanding any statute of limitations, lapse of time, or any prior court decision on this claim by any court of the United States, jurisdiction is hereby conferred upon the United States Court of Claims to hear, determine, and render judgment on the claim of Wah Chang Corporation against the United States for compensation for loss of property and for removal expenses incurred as a result of the acquisition in the year 1942 by the United States for military purposes of pier numbered 13, New York foreign trade zone, Staten Island, New York, which had theretofore been leased by said Wah Chang Corporation and upon which the said Wah Chang Corporation had erected and maintained a tungsten processing plant."

There is also a provision that "nothing contained in this Act shall be construed as an inference of liability on the part of the United States Government." This provision, coupled with the legislative history, indicates clearly that the Congress did not intend to waive any defenses the Government might have to the plaintiff's claim other than "any statute of limitations, lapse of time, or any prior court decision."

The plaintiff is a corporation engaged in refining and concentrating tungsten ore. In December 1940, the plaintiff, acting through an affiliate or subsidiary company, leased a part of pier 13 at Staten Island, New York. The pier was owned by the City of New York, but was held by a corporation named the New York Foreign Trade Zone Operators, Inc., under an arrangement with the city. A plant for the processing and refining of tungsten ore was established on the leased space, with plaintiff furnishing the machinery, the engineers, and the technical management of the operation. This was plaintiff's only plant. The lease provided that it should run until November 30, 1942, and thereafter could be terminated at the option of either party upon giving 60 days' notice.

The Reconstruction Finance Corporation (RFC), under the authority of section 5 of the Act of June 25, 1940, 54 Stat. 572, organized the Metals Reserve Company and vested it with power to

acquire tungsten and certain other strategic and critical materials. An acute shortage of tungsten existed in the year 1941, and it became necessary to purchase low-grade tungsten ore from South American countries and refine it in this country. Against this background the Metals Reserve Company entered into a contract with the plaintiff on August 1, 1941, under the terms of which the plaintiff agreed to handle and process tungsten ore for Metals Reserve. This tungsten ore was to be purchased in Bolivia and other South American countries by Metals Reserve and shipped to the plaintiff at its plant on pier 13 for treatment designed to eliminate the impurities and make it suitable for commercial use.

Metals Reserve agreed that the plaintiff should realize on its contract $391,000 per year for the 3-year life of the contract. Included in this figure was $20 per ton, or $100,000 per year, for plant amortization. There was also allowed 8 percent per year interest on capital invested (a total of $49,200 over the 3-year period), in addition to the recovery of ordinary and necessary operating expenses.

For the $391,000 payment Metals Reserve was entitled to the beneficiation (preparation for smelting) of 5,000 tons of ore. Payment was also to be made at the rate of $50 per ton for ore beneficiated in excess of 5,000 tons. Additional compensation, at the rate of $4 per ton, was allowed for the handling of all ores, including ores not requiring beneficiating.

The plaintiff, anticipating the successful conclusion of the negotiations with Metals Reserve, sought the rental of additional space on the pier to accommodate the contemplated enlargement of the plant and the expanded operations. The additional space was turned over to plaintiff by the lessor on August 18, 1941. All the terms of the original lease, including the November 30, 1942, expiration date, applied to the additional space. Thereafter the plaintiff commenced enlarging its plant and performing its contract with Metals Reserve.

On February 7, 1942, a petition in condemnation was filed at the request of the Secretary of War in the United States District Court, Eastern District of New York, for the acquisition, for a term of two years, of the use and occupancy of approximately 55 acres of land on Staten Island, including pier 13. The Army subsequently notified the plaintiff that its operation must be removed from pier 13 not later than October 1, 1942. The plaintiff asserts that the Government promised to pay the removal costs. The facts concerning this alleged promise, which is one of the bases for the plaintiff's claim, will be discussed later in the opinion.

Faced with the order to remove its operations from pier 13, the plaintiff, on April 10, 1942, exercised an option to purchase a plant site at Glen Cove, Long Island, and on May 9, 1942, submitted a plan to Metals Reserve whereby the Defense Plant Corporation [1] would buy plaintiff's Glen Cove site, build a plant thereon, and rent it to the plaintiff. On June 16, 1942, the plaintiff and the Defense Plant Corporation (DPC) entered into an "Agreement of Lease," in which it was agreed, among other things, that (1) DPC would purchase the Glen Cove site, (2) plaintiff would construct and equip the plant, (3) DPC would expend an amount not to exceed $360,000 (subsequently increased to $675,203.93) for the construction of the plant and the purchase of the site, (4) title to the site and the plant would be vested in DPC, (5) DPC would lease the site and the plant to the plaintiff, (6) plaintiff would have an option, on certain terms and conditions, to buy the site and the plant, and have the rent paid to DPC applied to the purchase price.

---

1. The Defense Plant Corporation was created by the RFC (pursuant to section 5 of the Act of June 25, 1940, 54 Stat. 573) to purchase and lease land, to build plants for the manufacture of armaments, and to lease these plants to private corporations.

732

After completing the removal of its operations from the pier on September 17, 1942, the plaintiff continued to refine and process tungsten for Metals Reserve at the new Glen Cove plant. The Government stipulated in this case that plaintiff "incurred a loss in the sum of $130,877.16 in removing its machinery, equipment and material from the plant on Pier 13, Staten Island, New York, and that no part of such loss has been repaid to * * [plaintiff] nor has it been otherwise reimbursed therefor * * *." The original August 1, 1941, contract with Metals Reserve was amended on February 15, 1943. On November 6, 1943, this contract, as amended, was revoked and a new contract was substituted. Thereafter, further contracts were entered into with Metals Reserve and the RFC extending into 1949. The plaintiff was paid over $2,700,000 for its services under these defense and wartime tungsten refining contracts with the Government; but the record does not indicate whether plaintiff made an over-all profit. The plaintiff ultimately purchased from DPC the Glen Cove plant, which it still owns.

The plaintiff's claim against the United States arises out of the Army's acquisition of pier 13 and consists of (a) the loss represented by the unamortized portion of the fixtures and equipment that could not be moved from the pier, and (b) the transportation, labor, and overhead costs incurred in removing from the pier to the Glen Cove site the movable portion of the fixtures and equipment.

The plaintiff has predicated its claim for relief on several independent grounds. They are: (1) The Government, through various departmental officials, promised to pay the expenses of removing the tungsten operation from the pier to a new location. (2) The Government is liable for the action of the War Department in obstructing and rendering more difficult the performance of plaintiff's tungsten contract with the Government-owned Metals Reserve Company. (3) The Government is liable as a condemnor for the loss of property and the expenses involved in removing the plaintiff's tungsten operation.

1. The plaintiff has attempted to show that the Government promised, expressly and by implication, to pay the cost of removal. When the attention of the War Department, which instituted the condemnation proceeding, was directed to plaintiff's tungsten contract, it advised plaintiff on February 11, 1942, that the plaintiff's request to continue tungsten operations on the pier had been approved; and on February 25, 1942, the War Department further advised that the length of time it would be permitted to stay had not as yet been determined, but that plaintiff would be promptly advised as soon as a decision was reached. Thereupon, several government agencies whose concern was the procurement of strategic materials and the financing of various aspects thereof, such as the War Production Board (WPB), the RFC, the Army and Navy Munitions Board (Munitions Board), the Defense Plant Corporation (DPC), and the Department of Commerce, gave consideration to the problem of the continuance of plaintiff's operations. Accordingly, the Munitions Board, at the instance of the WPB, inquired of the War Department and the Army concerning the possibility of plaintiff's being permitted to remain permanently upon the pier.

Subsequently, on March 10, 1942, the Munitions Board advised the WPB by memorandum that the Army had definitely determined that "in view of the urgent necessity for secrecy in regard to troop movements and the urgent need for this particular pier [13] for large vessels", it was "absolutely essential to move this plant to some other location", and that under the circumstances the Army felt that plaintiff's plant was "of very minor proportions." This memorandum further advised that the Munitions Board felt that *it would be to the interest of our war effort to expend a reasonable amount of money and move this enterprise to some other location*" because of "the importance of tungsten * * * in our program." [Emphasis supplied.]

The memorandum concluded with the statement that "it was never the [War Department's] intention to allow this enterprise to continue indefinitely but that they would be given a reasonable length of time in which to move the same to another location." On March 27, the plaintiff's president conferred with officials of the Munitions Board concerning the expenditure by the Government of a reasonable amount of money in moving the tungsten operations to another location. It was at this conference that the Chairman of the Munitions Board allegedly promised to pay the removal costs.

After considering the entire record, we are constrained to hold that the statements attributed to the Chairman of the Munitions Board did not constitute a promise to pay the removal costs but, rather, were merely an expression of willingness to assist the plaintiff in obtaining payment from the appropriate Government agency. The plaintiff was advised at the conference that the matter of reimbursement of removal costs was not within the Munitions Board's jurisdiction; and the plaintiff's subsequent communications to the Munitions Board, the War Department, and various other Government agencies, requesting assurances that the removal cost would be paid, clearly indicate that the plaintiff understood that no Government agency or official had in fact promised payment.

With respect to the alleged *implied* contract to pay removal costs, we cannot find adequate support in the record for the plaintiff's contention that Government agents directed plaintiff to expand its plant on pier 13 with knowledge of the losses that plaintiff might incur. Furthermore, the money expended by plaintiff subsequent to the commencement of the condemnation proceedings was not a substantial amount, and the record does not indicate whether this money was expended for plant expansion or was used merely for ordinary maintenance and upkeep.

Presumably, the plaintiff would have been justified in ceasing its tungsten operations under its contract with Metals Reserve when the condemnation proceedings were initiated in February 1942 (see Restatement, Contracts § 460 (1932)), and there can be no doubt that the Government accepted and paid for processed tungsten during plaintiff's uninterrupted continuance of its operations on the pier until the middle of September 1942. But we do not believe that the Government thereby impliedly promised to pay the removal costs *in addition to* the consideration stipulated in the written contract with Metals Reserve. On the contrary, it is obvious that the plaintiff, by its repeated attempts to secure assurances that removal costs would be paid, understood that, although payment had been recommended by the Munitions Board, no Government agency had made any promises.

In addition, the record in this case shows that plaintiff relinquished any *contractual* rights it might have had to payment of removal costs. On May 9, 1942, the plaintiff proposed, as a solution to the problem raised by the condemnation, that the Government buy the plaintiff's Glen Cove site, build a new plant thereon, and rent it to the plaintiff. In outlining this proposal, the plaintiff stated that "Wah Chang Trading Corporation will, of course, bear the cost of the removal of the plant facilities from Staten Island to Glen Cove and make claim therefor against the City of New York or the War Department with the help of your goodselves." The clear implication of this statement is that if the proposal were accepted the plaintiff would forego any claims against the Government for removal costs, except those attributable to the Government in its capacity as a *condemnor*. The Government accepted the plaintiff's proposal with this understanding.

2. This court has held that it is "an implied provision of every contract, whether it be one between individuals or between an individual and the Government, that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its perform-

**734**

ance." George A. Fuller Co. v. United States, 1947, 69 F.Supp. 409, 411, 108 Ct.Cl. 70, 94. See also United States v. Peck, 1880, 102 U.S. 64, 26 L.Ed. 46; 5 Williston, Contracts § 1293A (Rev.Ed. 1937); Restatement, Contracts § 315. Unquestionably, from the standpoint of cause and effect the War Department's condemnation of the pier rendered more costly plaintiff's performance of the tungsten contract with Metals Reserve.

■ Within the rule that prevention of performance by the other party constitutes a breach of contract there has been carved out the exception or qualification "that the United States as a *contractor* cannot be held liable directly or indirectly for the public acts of the United States as a *sovereign.*" Jones v. United States, 1865, 1 Ct.Cl. 383, 385. [Emphasis supplied.]

> "The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons. * * * In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, *such parties gain nothing by having the United States as their defendants.*" [2] [Emphasis supplied.]

This doctrine received the approval of the Supreme Court in Horowitz v. United States, 1925, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736.

As a practical test for determining the Government's liability "whenever the public and private acts of the government seem to commingle," this court has stated that

> "a citizen or corporate body must by supposition be substituted in * * * [the Government's] place, and then the question be determined whether the action will lie against the supposed defendant. [For example], if the enactment of a law imposing duties will enable the claimant to increase the stipulated price of goods he has sold to a citizen, then it will when the United States are defendants, but not otherwise. [See Deming v. United States, 1 Ct.Cl. 190 (1865).] If the removal of troops from a district liable to invasion will give the claimant damages for unforeseen expenses, when the other party is a corporate body, then it will when the United States form the other party, but not otherwise. This distinction between the public acts and private contracts of the government * * * we now desire to make so broad and distinct that hereafter the two cannot be confounded; and we repeat, as a principle applicable to all cases, that the United States as a contractor cannot be held liable directly or indirectly for public acts of the United States as a sovereign." [3]

We do not believe it is unfair to deny the plaintiff any advantage from having the Government as its defendant, since it merely places the plaintiff on an equal footing with others whose non-Government contracts might also have been frustrated by the condemnation. The question of whether the Government is liable as a *condemnor* will be dealt with later in the opinion.

The plaintiff, while accepting the doctrine formulated in Jones v. United

---

**2.** Jones v. United States, 1 Ct.Cl. at pages 384–385.

**3.** Jones v. United States, 1 Ct.Cl. at page 385.

States and sanctioned by the Supreme Court in Horowitz v. United States, argues that the courts have interpreted Horowitz as inapplicable to isolated and non-general acts of sovereignty. It relies on the statement in Horowitz that

"* * * Whatever acts the government may do, be they legislative or executive, so long as they be *public* and *general*, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons. * * * Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants." [Quoting from Jones v. United States, 1 Ct.Cl. at page 384.] [4]

■ Although the guidelines indicated here are not susceptible to mechanical application, we are persuaded that the temporary taking of the 55 acres on Staten Island, including plaintiff's interest in pier 13, for the purpose of facilitating and guarding the secrecy of troop movements in time of war was a "public and general" act of sovereignty "performed for the general good" within the meaning of the Horowitz doctrine, and that under the circumstances it is impossible to say that the condemnation was "so arbitrary and unreasonable as to * * * remove it from the category of sovereign acts which do not constitute breaches of implied terms in the contracts of the United States." Ottinger v. United States, 1952, 106 F.Supp. 198, 204, 123 Ct.Cl. 23, 48. See also Barnes v. United States, 1952, 105 F.Supp. 817; 123 Ct.Cl. 101; Borg-Warner Corp. v. United States, 1950, 89 F.Supp. 1013, 117 Ct.Cl. 1, certiorari denied 340 U.S. 946, 71 S.Ct. 531, 95 L.Ed. 682; J. B. McCrary Co. v. United States, 1949, 84 F.Supp. 368, 114 Ct.Cl. 12; Ross Electric Construction Co., Inc. v. United States, 1948, 77 F.Supp. 749, 111 Ct.Cl. 644.

The cases cited by the plaintiff in which this court granted recovery do not support a contrary result. In Sunswick Corp. v. United States, 1948, 75 F.Supp. 221, 109 Ct.Cl. 772, certiorari denied 334 U.S. 827, 68 S.Ct. 1337, 92 L.Ed. 1755, the Government agreed in the contract to compensate the contractor for extra wages paid by a change order initiated by the Wage Adjustment Board. Cf. United States v. Binghamton Construction Co., 1954, 347 U.S. 171, 74 S.Ct. 438, 98 L.Ed. 594.

In Gerhardt F. Meyne Co. v. United States, 1948, 76 F.Supp. 811, 815, 110 Ct.Cl. 527, the contractor sought to recover the cost of road maintenance made necessary by the Government's closing of the entrance to a road over which the contractor had planned to haul its materials to the job site. This court, in granting relief, found that the Government made a "direct promise" in the contract specifications that the road was available and that plaintiff's bid was based on this representation. We held in Gerhardt F. Meyne Co. that "Defendant cannot enter into a binding agreement that it will not exercise a sovereign power, but it can say, if it does, it will pay you the amount by which your costs are increased thereby." This rule has no application to the case at bar, since we find that the Government did not in fact promise to compensate for the losses arising from the condemnation.

■■ 3. We now reach the question of whether the Government is liable under Federal condemnation law. The plaintiff filed a claim in the original condemnation proceeding, but it was subsequently withdrawn. This court is able to pass on that claim now only by virtue of the specific terms of the private act authorizing this suit. In considering this aspect of the case, we are confronted at the outset with the now well-settled rule that "when there is an entire taking of a condemnee's property, whether that property represents the interest in a leasehold or a fee, the expenses of re-

4. 267 U.S. at page 461, 45 S.Ct. at page 344.

moval or of relocation are not to be included in valuing what is taken." United States v. Westinghouse Elec. & Mfg. Co., 1950, 339 U.S. 261, 264, 70 S.Ct. 644, 646, 94 L.Ed. 816. This is but a variation of the rule against allowance for "consequential losses" in Federal condemnation proceedings. United States v. Petty Motor Co., 1946, 327 U.S. 372, 377–379, 66 S.Ct. 596, 90 L.Ed. 729. We find nothing in the act authorizing this suit which would indicate that the Congress intended to deny the Government the benefit of this rule. Since the Government took the whole of the plaintiff's lease—which was to run only until November 30, 1942, with no *right* of renewal [5]—it cannot be held liable as a *condemnor* for the "expenses of removal or of relocation." Neither is the Government liable under Federal condemnation law for a frustration of plaintiff's contract with Metals Reserve. Omnia Commercial Co. v. United States, 1923, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773.

The parties apparently tried the case before the trial commissioner on the assumption that the plaintiff's *loss of property* incurred as a result of the condemnation should be treated as one of the "expenses of removal or of relocation." The Supreme Court, however, made it clear in United States v. General Motors Corp., 1945, 323 U.S. 373, 383–384, 65 S.Ct. 357, 362, 89 L.Ed. 311, that a tenant's property rights in "fixtures and permanent equipment" are distinct, not only from the "right of occupancy", but from the "expenses of removal".

■ Without question, the record shows there was a taking of the plaintiff's right of occupancy and a temporary taking of the fixtures and equipment from the time plaintiff left the premises, September 17, until the expiration date of the lease, November 30, 1942, for which the plaintiff is entitled to compensation. United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357. On July 5, 1960, pursuant to order of reference, the parties filed a stipulation, which is contained in the Supplemental Report of the trial commissioner, whereby it was agreed that the value of plaintiff's right of occupancy from September 17, 1942, to November 30, 1942, was $1,196.71; and that the rental value of the fixtures and permanent equipment not removed, from September 17, 1942, to November 30, 1942, was $2,546.95. This stipulation on the question of valuation is adopted by the court.

Plaintiff is therefore entitled to recover the sum of $3,743.66, and judgment will be entered for plaintiff in that amount, with interest thereon as part of just compensation at the rate of 4 percent per annum from November 30, 1942, to date of payment.

It is so ordered.

DURFEE, LARAMORE, MADDEN, and WHITAKER, Judges, concur.

5. Assuming, as plaintiff contends, that plaintiff's lease would in all probability have continued without cancellation by either party for a period of time extending beyond the Government's temporary 2-year taking in condemnation, this fact added nothing to the plaintiff's legal rights as a tenant, "and legal rights are all that must be paid for." United States v. Petty Motor Co., 327 U.S. at page 380, fn. 9, 66 S.Ct. at page 601.