FAR WEST FEDERAL BANK,
S.B., et al., Plaintiffs,

v.

DIRECTOR, OFFICE OF THRIFT
SUPERVISION, et al.,
Defendants.

CV No. 90–103–PA.

United States District Court,
D. Oregon.

March 9, 1992.

Barnes H. Ellis, Christine Kitchel, Stoel, Rives, Boley, Jones & Grey, Portland, Or., Wesley G. Howell, Jr., John C. Millian, Gibson, Dunn & Crutcher, Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., Leslie H. Southwick, Deputy Asst. Atty. Gen., Charles H. Turner, U.S. Atty., Herbert C. Sundby, Asst. U.S. Atty., Brook Hedge, Theodore C. Hirt, Jeffrey S. Gutman, Gary W. Herschman, Dept. of Justice Civ. Div., Washington, D.C., for defendant FDIC.

Eugene M. Katz, Acting Chief Counsel, Thomas J. Segal, Associate Chief Counsel, Aaron B. Kahn, Sr. Trial Atty., Elizabeth R. Moore, Sr. Trial Atty., Office of Chief Counsel, Office of Thrift Supervision, Washington, D.C., for defendant Director, Office of Thrift Supervision.

## OPINION

PANNER, District Judge.

The investor plaintiffs seek summary judgment on Count IV (rescission and restitution) of their first amended and supplemental complaint (now Count I of the second amended and supplemental complaint) on the issue of liability. Defendant, Federal Deposit Insurance Corporation (FDIC), seeks summary judgment against Count IV on the issues of liability and damages. Plaintiffs' motion is granted. Defendant's motion is denied.

## BACKGROUND

I. *The 1987 Conversion Agreement.*

Far West is a federally chartered thrift. The Office of Thrift Supervision (OTS) was created by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (1989), as the federal agency given primary regulatory authority over thrifts. Before FIRREA, most of OTS's regulatory functions were performed by the Federal Home Loan Bank Board (FHLBB). The Federal Savings and Loan Insurance Corporation (FSLIC), an arm of FHLBB, was the deposit insurer. Defendant FDIC now insures Far West's deposits. FHLB–Seattle is one of twelve federal home loan banks.[1]

In the early to mid–1980's, Far West experienced severe financial difficulties. FHLBB and Far West began to investigate various ways to keep Far West afloat and avoid a financial disaster for Far West and its deposit insurer, FSLIC.

In 1986, a search began for sources of private funds to recapitalize Far West. In 1987, Far West and FHLBB identified a group of venture capitalists (the investor plaintiffs) as a possible source. Negotiations began on a deal under which plaintiffs would invest about $27 million into Far West, in exchange for a number of regulatory forbearances and loans to assist Far West in becoming profitable over a ten year period. Extensive negotiations between Far West, plaintiffs and the federal agencies culminated with the 1987 Conversion Agreement.

The Conversion Agreement is a set of related agreements among Far West, plaintiffs, FHLBB, and FHLB–Seattle. It contains a number of provisions central to this action.

First, the Conversion Agreement converted Far West into a stock savings association, with plaintiffs as the stockholders. Second, Far West received a forbearance from enforcement of the standard regulatory capital and operating requirements in effect.

Third, the Conversion Agreement established a ten-year business plan and Modified Capital Requirements for Far West, stated in Schedule P of the Conversion Agreement. Far West would be deemed in compliance with regulatory capital requirements *"for all purposes* under the Insurance Regulations [then in effect] if Far West is in compliance with its Modified Capital Requirement." (emphasis supplied). Schedule P provides that "the components of 'regulatory capital' will be as defined [under then-effective Insurance Regulations] ..., *notwithstanding any subsequent changes in the definition of regulatory capital ...* [with exceptions not pertinent here]." (emphasis supplied).

Fourth, FHLB–Seattle agreed to provide Far West a "credit facility", which is $1.5 billion in loans and guarantees. The Credit Facility Loan Agreement permits Far West to invest the credit facility in "acceptable assets", defined as:

good quality (i) loans secured by mortgages or deeds of trust covering securities; (ii) consumer loans; (iii) mortgage-backed stocks; (iv) corporate debt securities; (v) preferred stocks; (vi) securities issued or guaranteed by the United States or any agency thereof; (vii) derivatives of mortgage-backed securities; (viii) cash or cash equivalents; (ix) securities backed by permanent commercial real estate mortgages; and (x) state and municipal securities.

1. OTS and FHLB–Seattle are no longer named defendants in this action.

Fifth, the Conversion Agreement contains a number of provisions to enable Far West to use the credit facility. Far West could amortize the credit facility on a twenty-five year, straight line schedule. FHLB–Seattle waived liability growth limitations on Far West. The credit facility was defined as an intangible asset, to be included in Far West's regulatory capital.

## II. *FIRREA.*

The conditions leading to the passage of FIRREA are well-known. Mismanagement, fraud, incompetence, and permissive regulation led to a massive number of thrift failures throughout the country, and threatened to bankrupt FSLIC deposit insurance funds. FIRREA was a sweeping attempt to bring the "S & L crisis" under control, recapitalize deposit insurance funds, and tighten regulatory control over the thrift industry.

## III. *OTS Actions after Enactment of FIRREA.*

### A. Determination that Far West is Capital Deficient.

In December, 1989, after promulgating its regulations, OTS determined that Far West did not comply with the new capital requirements established in § 301 of FIRREA. Pursuant to its regulatory authority, OTS directed Far West either to show compliance with FIRREA or submit a plan to achieve compliance by December 1994. In response, Far West submitted the 10–year plan established in the Conversion Agreement.

On April 24, 1990, OTS notified Far West that it disapproved of the Conversion Agreement plan, in part because the plan relied on substantial government assistance. OTS deemed Far West out of compliance with capital requirements and imposed more stringent capital requirements. It directed Far West's directors to execute a Consent Agreement permitting OTS to take virtually the same regulatory action permitted under FIRREA, including placing Far West into receivership or conservatorship. The TRO and preliminary injunctions issued in this action prohibited enforcement of the April 24, 1990, letter and the Consent Agreement.

### B. Reducing the Loan to One Borrower (LTOB) Limit.

The LTOB limit caps the amount of credit a thrift can extend to a single borrower. Its purpose is to reduce the chances that financial problems of a single, large borrower will destroy the thrift.

The Conversion Agreement does not expressly refer to the LTOB. However, it provides that the credit facility is to be accounted for as an intangible asset. It also provides that intangible assets are to be included in the calculation of Far West's "regulatory capital" and defines regulatory capital "for all purposes". The pre-FIRREA LTOB limit was calculated as a percentage of regulatory capital.

Therefore, defining the credit facility as an intangible asset increased Far West's LTOB above what it would otherwise be. This permitted Far West to make larger, more profitable loans than it could with a lower LTOB limit. After the Conversion Agreement, Far West established "niche lending" businesses, primarily commercial lines of credit, real estate investments, and consumer credit cards. These are particularly profitable loans, generally between $1–$5 million.

By amending the Home Owner's Loan Act of 1933 (HOLA), § 301 of FIRREA modified the calculation of the LTOB, to a percentage of "unimpaired capital and unimpaired surplus." Home Owner's Loan Act of 1933, § 5(u), 12 U.S.C. § 1464(u); 12 U.S.C. § 84. Intangible assets, such as the credit facility, are not included in "unimpaired capital and unimpaired surplus".

Beginning in December 1989, OTS notified Far West that its LTOB limit would be $500,000, without regard to the credit facility or Far West's regulatory capital. This restriction severely hampered the "niche lending" businesses because the loan amounts generally exceed $500,000.

### C. Restrictions on the Use of the Credit Facility.

Based on its determination that Far West was capital deficient under FIRREA, OTS

imposed a number of restrictions on Far West which affected its use of the credit facility. OTS directed Far West to cease purchasing and divest itself of high yield corporate bonds (commonly known as "junk bonds") in accordance with § 222 of FIRREA, 103 Stat. at 270, 12 U.S.C. § 1831e. Second, OTS prohibited Far West from accepting, renewing, or rolling over brokered deposits without an express waiver from FDIC.[2] Third, OTS restricted Far West's growth, contrary to the waiver in the Credit Facility Loan Agreement. Fourth, OTS restricted the types of assets that Far West can use as collateral to secure the credit facility.

## STANDARDS

Fed.R.Civ.P. 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party shows the absence of an issue of material fact, the nonmoving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). Reasonable doubts about the existence of a factual issue should be resolved against the moving party. *T.W. Elec. Serv.*, 809 F.2d at 631. The court must view the inferences drawn from the facts in the light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630–31.

## DISCUSSION

The investor plaintiffs seek rescission of the Conversion Agreement based on the doctrines of frustration of purpose and impossibility, and restitution of plaintiffs' investment in Far West. They assert that the enactment of FIRREA frustrated a central purpose of the Conversion Agreement, thereby rendering its performance impossible. Plaintiffs argue, in the alternative, that the government's material breach of the agreement warrants rescission and an award of restitution.

Defendant raises several arguments in support of summary judgment. It contends that (1) plaintiffs never had a contractual right to engage in activities prohibited by federal statute, (2) plaintiffs lack contractual privity with defendant, lack standing to sue for damages to Far West, and are precluded from asserting claims against the government under the sovereign acts doctrine, (3) plaintiffs are barred by equitable principles from obtaining restitution, and (4) plaintiffs are unable to establish frustration of purpose or failure of consideration. Before reaching the central issue raised by plaintiff's motion (i.e., whether plaintiffs have established adequate grounds for rescinding the Conversion Agreement), I must address defendant's arguments.

I. *Plaintiff's do not assert a right to engage in activities prohibited by statute.*

Defendant submits that plaintiffs have premised their rescission claim on the loss of a contractual right which, in reality, they never had. It argues that the Conversion Agreement did not give plaintiffs a license to conduct their business in violation of federal statutes and, consequently, FIRREA's passage could not have deprived plaintiffs of a contractual right.

Defendant's argument is without merit. Plaintiffs do not now contend that the Conversion Agreement insulated them from subsequent changes in banking regulations, nor that Congress was prohibited from enacting laws in derogation of the Conversion Agreement. Plaintiffs instead assert that, having exercised its power to regulate the banking industry by the enactment of FIRREA, the government could no longer live up to its obligations under the

2. Brokered deposits are large funds collected and deposited by intermediary retail entities.

Conversion Agreement. The rescission claim is founded on the government's inability to render the promised performance. Plaintiffs therefore do not, in this claim, seek to rescind the Conversion Agreement based on the loss of an illusory or imagined contractual right.

II. *Plaintiffs are not barred from bringing action against defendant based on lack of privity or standing, nor under the Sovereign Acts doctrine.*

A. Defendant was bound by the Conversion Agreement.

■ Defendant contends that it cannot be held liable in rescission and restitution because neither it nor FSLIC is a party to the Conversion Agreement. I disagree.

Defendant's argument conveniently ignores the relationship between, on the one hand, FDIC and FSLIC, and on the other hand, the FHLBB, the actual signatory to the Conversion Agreement. As plaintiffs note, FSLIC was the "insurance arm" of FHLBB and, as such, it was bound by any contractual obligations by which FHLBB was bound. Pursuant to FIRREA, FDIC succeeded to FHLBB's duties and obligations in the area of deposit insurance, and assumed responsibility for FSLIC's assets and liabilities. 12 U.S.C. § 1821a(a)(2). Given the strong identity of interest between FDIC and FHLBB, I cannot permit FDIC to avoid responsibility for the alleged failure of the Conversion Agreement.

B. Plaintiffs seek to vindicate their own legal rights, not those of Far West.

Relying on fundamental principles of corporations law, defendant argues that plaintiffs lack standing to bring an action for injuries suffered by Far West. Defendant mistakes the nature of plaintiffs' claim.

This is not a case where a group of shareholders has appropriated a claim rightfully belonging to the corporation in which they hold an interest. Plaintiffs have not attempted to assert a cause of action on behalf of Far West, nor do they attempt to recover damages for injuries allegedly sustained by Far West. To the contrary, they seek redress for the loss of contractual rights arising under the Conversion Agreement—rights that are held by, and inure to the benefit of, plaintiffs, both as a group and individually. Accordingly, defendant's attempt to characterize this action as an unauthorized shareholder suit on behalf of Far West must fail.

C. The sovereign acts doctrine has no application to this case.

Defendant argues that plaintiffs suit is barred by the sovereign acts doctrine. I disagree.

The sovereign acts doctrine generally provides that "... the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." *Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 344, 69 L.Ed. 736 (1925). Applied to the present case, the doctrine provides that the FDIC (the contracting branch of the government) cannot be deemed to have breached its contract with plaintiffs solely because the Congress (the sovereign branch of the government) passed a law which obstructed the performance of that contract. Instead, "... [the FDIC] may be held liable only within the same limits that any other defendant would be in any other court." *Id.*

■ I agree with plaintiffs that the sovereign acts doctrine was intended to place the government, when sued as a contractor, on equal footing with similarly situated actors in the private sector. *See, e.g., Security Federal Savings and Loan of Albuquerque v. FSLIC,* No. CIV 89-1358 (D.N.M. November 5, 1991); *Wah Chang Corp. v. United States,* 282 F.2d 728 (Ct.Cl.1960). Two conclusions necessarily follow: First, the FDIC cannot be in breach of the Conversion Agreement to the extent its failure to perform is attributable to FIRREA, a law of general applicability enacted by the United States in its capacity as sovereign; and second, the FDIC, like any other private contracting party, can be party to a contract whose principle purpose is frustrated by the enactment of new leg-

islation. *See, e.g., Charter Federal Sav. v. Director, OTS,* 773 F.Supp. 809, 816 (W.D.Va.1991) (declaratory judgment that "[a]ny government enforcement action that makes performance impossible will rescind the contract ·...").

■ I conclude that plaintiffs claim for rescission and restitution based on frustration of purpose is entirely consistent with the purposes of the sovereign acts doctrine.

### III. *Equitable principles do not bar plaintiff's suit.*

A. FDIC has benefitted from the Conversion Agreement.

■ Defendant argues that it received no benefit from the Conversion Agreement and, therefore, there is no equitable basis for an award of restitution. Defendant reasons that, under FIRREA, neither it nor the FSLIC Resolution Fund bears financial responsibility for resolving the affairs of Far West. Therefore, the Conversion Agreement does not, as plaintiffs allege, relieve it of an onerous financial obligation it would otherwise have paid.

Defendant's argument misses the mark. As a result of plaintiffs' willingness to provide a much-needed infusion of capital, the FHLBB, through FSLIC, was able to avoid the heavy cost of resolving Far West. Indeed, without the prospect of such significant savings, there would have been no incentive for the government to contract with plaintiffs. Therefore, it cannot be disputed that, at the time the parties entered into the Conversion Agreement, the government reaped a considerable benefit. That the benefit conferred has since been dissipated or passed on to an independent third party, as defendant contends, is of no consequence. To hold otherwise would result in an undeserved windfall for defendant.

B. Plaintiffs are not barred from seeking rescission and restitution under the doctrine of election of remedies.

■ Defendant argues that plaintiffs cannot obtain rescission of the Conversion Agreement because, at the outset of this action, they sought specific performance of the contract. The Ninth Circuit, however, has ruled that plaintiffs are not entitled to specific performance and has directed this court to dissolve its permanent injunction. Because injunctive relief is unavailable, plaintiffs may proceed on their claim for rescission. *Far West Federal Bank, S.B., et al. v. Director, Office of Thrift Supervision, et al.,* 951 F.2d 1093, 1096 (9th Cir. 1991) ("If FIRREA did supersede the conversion agreement, Far West may go forward on Count IV ... of its complaint").

C. Plaintiffs' suit is not barred by the availability of a legal remedy.

Defendant contends that plaintiffs should not be permitted to obtain rescission and restitution because they have an adequate remedy at law. However, defendant demonstrates neither that plaintiffs' remedy at law is adequate, nor that rescission is improper where a contract is challenged under the doctrines of frustration of purpose or impossibility. Under the circumstances, I do not regard rescission as an improper remedy.

D. Rescission would be neither impractical nor inappropriate.

■ Defendant argues that rescission of the Conversion Agreement is impractical because, in light of changed circumstances, there is no way to return the parties to their *status quo ante.* Defendant's argument is seriously flawed.

Defendant asserts that, prior to the Conversion Agreement, FSLIC had at its disposal several methods of dealing with the impending insolvency of Far West. It argues that, if the Conversion Agreement is rescinded now, FDIC would have in its arsenal no comparable means of resolving Far West's difficulties. This argument, however, ignores the fact that Far West's fate now rests in the hands of defendant Resolution Trust Corporation (RTC). Because Far West is no longer defendant FDIC's responsibility, rescission of the contract would not necessitate a potentially costly rescue operation on the part of FDIC.

■ Defendant further argues that restitution is inappropriate because any calculation of plaintiffs' loss would be speculative. I disagree. Assuming plaintiffs can establish proper grounds for rescission of the Conversion Agreement, the most appropriate measure of restitution—the amount of plaintiff's investment in Far West— would not require the court to engage in a speculative damages calculation.

## IV. *Plaintiffs have established an entitlement to rescission.*

A party seeking to rescind an agreement based on frustration of purpose must establish the occurrence of a supervening circumstance by which "... a thing, event or condition which was essential so that the performance would yield to the promisor the result which the parties intended him to receive, fails." *West Los Angeles Institute for Cancer Research v. Mayer*, 366 F.2d 220, 223 (9th Cir.1966). Rescission of a contract based on impossibility of performance requires a similar showing. *See, e.g., Opera Co. of Boston v. Wolf Trap Foundation*, 817 F.2d 1094, 1102 (4th Cir. 1987) (the elements of impossibility are: (1) the occurrence of an intervening act; (2) the non-occurrence of the act was a basic assumption of the agreement; and (3) the occurrence of the act made performance impracticable). Under either doctrine, plaintiffs have established appropriate grounds for rescission of the agreement.[3]

### A. The government's promises go to the principal purpose of the Agreement.

■ This court is by now well acquainted with both the content of the Agreement and the central purposes underlying its creation. No purpose would be served by reexamining these issues at this stage of the proceedings. I will not depart from my previous finding that the establishment of fixed regulatory standards regarding capital requirements and loans to one borrower, and the creation of the credit facility, go to the very heart of the parties' agreement.

### B. The enactment of FIRREA substantially frustrated the purpose of the Agreement.

■ The Ninth Circuit ruled that the enactment of FIRREA abrogated inconsistent provisions of the Conversion Agreement. As a result, the contract's provisions regarding capital standards and LTOB are not enforceable. It follows, therefore, that FIRREA's passage resulted in the frustration of the contract's fundamental purpose.

Defendant argues that plaintiffs cannot establish grounds for rescission absent a showing that FIRREA led to Far West's demise, or that Far West's failure was caused by defendant. Defendant contends that the Far West has not been adversely affected by FIRREA and, therefore, the government's inability to render the agreed upon performance should be of no consequence. In support, defendant notes that, due to the issuance of injunctive relief by this court, FIRREA's requirements were imposed on Far West only for a brief time. It further notes that FIRREA did not seriously interfere with Far West's business in the areas of risk-controlled arbitrage, commercial finance, real estate loans, AAA credit cards, deposit losses, and mortgage selling and servicing.

I reject defendant's arguments. Plaintiffs need not prove that Far West failed, nor that FIRREA's passage adversely affected Far West's "bottom line" in specific areas of business. Instead, they need only establish that FIRREA's enactment made impossible or impracticable the performance of the promises that formed the basis of their bargain. Defendant cannot reasonably contend that the government was in a position to honor its obligations under the Conversion Agreement after FIRREA's passage. Therefore, plaintiffs have established frustration of the contract's purpose.

---

**3.** In view of my findings on the issues of frustration of purpose and impossibility of performance, it is not necessary that I reach plaintiffs' alternative argument that rescission is warranted by the government's material breach of the agreement.

C. The "non-occurrence" of FIRREA was a basic assumption of the parties.

■ The parties contracted with the assumption that the regulatory forbearances and credit facility established by the Conversion Agreement would be an integral part of a ten-year business plan for Far West. The government, no less than plaintiffs, intended that the promises specified in the Conversion Agreement would be kept. The non-occurrence of an event which would prevent the government from honoring its obligations under the Conversion Agreement (e.g. the enactment of new banking laws inconsistent with the contract) was therefore a basic assumption of the parties in creating the contract.

Defendant argues that the enactment of FIRREA was foreseeable. In support, it points out that the banking industry has for many years been the subject of vigorous regulation. However, I am not persuaded that plaintiffs must establish the "non-foreseeability" of FIRREA in order to prove frustration of purpose or impossibility of performance. *See Restatement (Second) of Contracts* § 261, comment b (1981) ("[t]he fact that the event was foreseeable, or even foreseen, does not necessarily compel a conclusion that its non-occurrence was not a basic assumption"). Further, even if it was entirely foreseeable that Congress would enact FIRREA (or some other law affecting the banking industry), FIRREA's impact on the Conversion Agreement was not foreseeable. In view of the contractual commitments contained in the Conversion Agreement, it is clear that neither plaintiffs nor the government anticipated that the agreement would be abrogated by subsequent legislation. Therefore, I am satisfied that the "non-occurrence" of FIRREA was a basic assumption underlying the contract. For the same reason, I reject defendants' argument that plaintiffs "assumed the risk" that the contract would be vitiated by new legislation.

V. *Plaintiffs are entitled to restitution of their investment in Far West.*

Having decided that rescission of the Conversion Agreement is appropriate, I must now determine the measure of restitution. The parties have briefed this issue, and have asserted various arguments to support their respective positions. Both parties request a trial to establish the appropriate measure of restitution.

A. The amount of restitution.

■ The investor plaintiffs take the position that any award of restitution should reflect, not only their initial investment in Far West, but also the increase Far West's value as a result of their stewardship. Relying on the *Restatement (Second) of Contracts* § 371 (1981), plaintiffs argue that there are two available methods of determining the amount of restitution: (1) the reasonable value of the benefit conferred on defendant by plaintiffs; and (2) the extent to which defendant's monetary interests have been advanced. Under either standard, plaintiffs argue, the award of restitution should be no less than $130 million.

Defendant argues that an award of restitution, even if appropriate as against RTC, should in no event come from FDIC. In the alternative, defendant argues that any award of restitution must be capped at approximately $23 million (reflecting the $27 million invested in Far West by plaintiffs, less costs associated with the issuance of Far West stock, adjustments to paid-in capital, and legal fees incurred in this case).

I note that only a modest part of the $130 million recovery sought by plaintiffs is intended to represent their cash investment in Far West. By far the larger share of that amount reflects a claimed increase in Far West's value as a result of plaintiffs' stewardship of the bank. The Conversion Agreement, however, is not concerned with the provision of goods or services which can be valued on the open market. The benefit conferred on defendant under the agreement was monetary. Its value was fixed by the amount of plaintiffs' investment. There is no evidence that defendant received from plaintiffs any benefit over

and above the $27 million cash infusion called for by the agreement.[4] I therefore reject plaintiffs' argument that the value of the benefit they conferred on defendant far exceeds the value of their investment.

By way of their rescission claim, plaintiffs have asked to be restored to the position they would have occupied in the absence of the Conversion Agreement. That result is best accomplished by returning to plaintiffs the benefit they conferred under the contract; namely, the amount of their investment in Far West. *See Restatement of Restitution* § 150 (1937) ("In an action of restitution in which the benefit received was money, the measure of recovery for this benefit is the amount of money received"). Accordingly, there is no need for a trial to fix the amount of restitution.

I am also satisfied that the burden of restitution should be borne by defendant. I need not reconsider defendant's argument the RTC, rather than defendant, was the principle beneficiary of plaintiffs' investment in Far West. Defendant, through its predecessor, the FHLBB, received a considerable benefit under the Conversion Agreement. I will not permit defendant to avoid its duty to make restitution simply because the benefit it received has since been passed on to another party.[5]

B. Prejudgment interest.

Plaintiffs contend that prejudgment interest should be included in the award of restitution. They argue that defendant's waiver of sovereign immunity under a "sue and be sued" clause should be construed broadly to include liability for prejudgment interest. I disagree.

■ Although plaintiffs correctly observe that defendant has waived sovereign immunity for purposes of suit, it does not automatically follow that the waiver extends to awards of interest. The scope of the waiver, if not clearly defined in a contract or statute, must be determined by reference to underlying congressional policy. *Franchise Tax Bd. of Cal. v. U.S. Postal Serv.*, 467 U.S. 512, 521, 104 S.Ct. 2549, 2554, 81 L.Ed.2d 446 (1984). Moreover, "[w]hen Congress has intended to waive the United States' immunity with respect to interest, it has done so expressly ...." *Library of Congress v. Shaw*, 478 U.S. 310, 318, 106 S.Ct. 2957, 2963, 92 L.Ed.2d 250 (1986).

■ I am not persuaded that defendant's waiver of immunity to suit encompasses liability for prejudgment interest. The waiver of immunity under the sue and be sued clause must be strictly construed in favor of the United States. *Id.* Congress, in enacting the Federal Deposit Insurance Act, 12 U.S.C. § 1811 et seq., and subsequent banking legislation, made no specific provision for awards of interest against defendant. I will not expand defendant's waiver of immunity beyond the bounds established by Congress. Other courts have reached the same result. *Philadelphia Gear Corp. v. FDIC*, 751 F.2d 1131, 1138–39 (10th Cir.1984), *rev'd on other grounds*, 476 U.S. 426, 106 S.Ct. 1931, 90 L.Ed.2d 428 (1986); *Marchese v. FDIC, et al.*, 781 F.Supp. 241 (S.D.N.Y.1991).

In so ruling, I reject plaintiffs' contention that this case resembles *Standard Oil Co. of New Jersey v. United States*, 267 U.S. 76, 45 S.Ct. 211, 69 L.Ed. 519 (1925). In *Standard Oil*, an award of interest was justified where the federal government, acting in the same manner as a private entity, embarked on a commercial insurance enterprise and realized a profit. Defendant, in contrast, is an agency established by congressional enactment to fulfill a discrete governmental function—the regulation of the banking industry. As such,

---

**4.** In particular, there is no persuasive evidence that plaintiffs' efforts brought about a significant improvement in Far West's financial condition following the Conversion Agreement. In any event, such an improvement would have inured to the benefit of plaintiffs, as shareholders, no less than defendant.

**5.** Defendant also argues that plaintiffs engaged in material misrepresentations at the time they entered into the Conversion Agreement. Such conduct, defendant reasons, precludes an award of equitable relief under the doctrine of unclean hands. Defendant's accusations are conclusory and untimely. The argument does not warrant further consideration.

it is not subject to the same incidents of suit as was the Bureau of War Risk Insurance in *Standard Oil.*

## CONCLUSION

Plaintiffs' motion for summary judgment is granted. Defendant's motion for summary judgment is denied. The Conversion Agreement is rescinded. Plaintiffs are entitled to restitution from defendant in an amount equal to their cash investment in Far West. The parties shall be given ten days in which to submit documentation regarding the exact amount of plaintiffs' investment, after which the court shall determine the award of restitution.