Dtjrfee, Judge,
delivered the opinion of the court:
In this proceeding plaintiffs seek to recover losses incurred in the performance of four government construction contracts during 1943 and 1944, which losses allegedly resulted directly from wrongful action and inaction by certain government officials. More specifically the losses are alleged to have resulted from wrongful failure of the Tulsa office of the United States Employment Service to refer skilled labor to plaintiffs for work on their construction projects under the four contracts.
This matter has been presented for our consideration in a previous proceeding in which we concluded, after thorough consideration of the facts and arguments, that plaintiffs were not legally entitled to recover. Ottinger Brothers v. United States, 123 Ct. Cl. 23 (1952). The basis of that decision was that labor was not referred to plaintiffs for work on their projects pursuant to a uniformly applied policy of national interest, which was neither arbitrary nor unreasonable in any manner that would remove it from the realm of sovereign acts which would not constitute breaches of implied terms in contracts of the United States. Plaintiffs’ motion for reconsideration was subsequently denied.
On March 31, 1955 a bill was introduced in the House of [Representatives (H.R. 5461), to “confer authority on the *15 Secretary of the Army to pay certain claims of the Ottinger Brothers.” On July 3, 1956 the House of Representatives adopted a resolution (H. Res. 531) which read in part as follows:
Resolved, That the bill (H.R. 5461) entitled “A bill to confer authority upon the Secretary of the Army, to pay certain claims of Ottinger Brothers,” together with the accompanying papers, notwithstanding the statute of limitations, be referred to the United States. Court w Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House of Representatives, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and. character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
It is on the basis of a petition filed pursuant to the above resolution that this case was tried and is presently before us.
Plaintiffs are brothers who during the period 1940-1945 were, in partnership, engaged in operating a general construction business. During this period the major portion of their work related to construction for agencies of the United States. In this proceeding we are concerned with work on four contracts which plaintiffs entered with the Corps of Engineers for construction pursuant to a flood control project near Tulsa, Oklahoma. The contracts were dated September 22 and December 6,1943, and January 3 and February 29, 1944.
During the period with which we are presently concerned the nation was at war, the supply of labor was diminished, and the demands being placed upon the available labor supply by mobilization of our industrial plant and economy for the military effort were enormous. The War Manpower Commission had been created in 1942 to plan and establish policies for the most effective mobilization and utilization of the nation’s available manpower for the prosecution of the war, and the United States Employment Service (hereinafter USES), which had been created in 1933 (48 Stat. 113) was placed within the orbit of responsibility of the *16 Commission. Regional Directors were appointed by the War Manpower Commission, each of whom was responsible for the management and field operation of the manpower program in his own region, including the local offices of the US'ES. Each Regional Director was afforded the advice of a regional Management-Labor Committee, which was, as the name would indicate, composed of members of industry and labor active in the region.
The USES historically followed a policy of complete neutrality regarding labor disputes. Thus, upon filing of a notice of the existence of a labor dispute by a union, the local USES office would, pursuant to a uniform policy, cease referrals of labor to the employer involved. Plaintiffs were aware of this policy prior to their bidding on the contracts now before us. During August 1948, while plaintiffs were engaged in another government contract construction project in the area, several unions filed with the Tulsa office of the USES notices of the existence of a dispute with plaintiffs on the project, and thereafter the USES ceased further referrals of labor. The basis of the dispute lay in the fact that labor in the area was largely unionized, and while most other employers in the construction business in the area operated under union shop contracts, plaintiffs remained adamant regarding retention of an open shop. Despite failure of the USES to refer labor to plaintiffs on this project, work was completed satisfactorily and this contract is not involved in the present proceeding.
When, in September 1943, plaintiffs accepted contract 2124, the earliest of the four contracts presently before us, they knew or should have known of the possibility of labor disputes arising during the course of their performance of the contract, and plaintiffs were aware of the action that would be taken by the USES upon its receipt of any notice of the existence of any such dispute. Work was begun preparing the site for performance of contract 2124 on October 6, 1943, by a small force of plaintiffs’ employees who had been recruited by plaintiffs without assistance of the USES. On October 6, 1943, the Alliance of Tulsa Building Trades (hereinafter the “Alliance”), notified the USES office of the existence of labor difficulties with plaintiffs regarding the *17 wort on contract 2124. The USES office thereafter declined to honor plaintiffs’ subsequent requests for referrals of labor for work on contract 2124.
After concerted effort by various individuals including a commissioner of conciliation of the United States Conciliation Service, Department of Labor, an oral agreement for settlement of the dispute was reached between the Alliance and plaintiffs on November 7,1943. As part of the agreement plaintiffs agreed that after December 1, 1943, only union workers would be employed on the project, while the union agreed in return to withdraw the notice of dispute it had filed with the USES. During the weeks immediately subsequent to this agreement the USES referred labor as requested by plaintiffs to the proj ect. By the end of November, 173 workmen were working on the project, most of whom belonged to the union.
Soon after the agreement had been reached it became apparent that the parties disagreed on its meaning. Plaintiffs were of the belief that pursuant to the agreement they were required to employ only union workers in all hiring done after December 1,1943, but that those workers who had been hired prior to that date and who held no affiliation with the union would not be required to secure union membership as a condition to continued employment. On the other hand the Alliance construed the agreement as requiring an absolute union shop operation covering all employees after December 1, 1943. As this misunderstanding had not been resolved by December 1,1943, on that date the Alliance filed another notice of the existence of a labor dispute with the USES'. On December 6, 1943, work on the project ceased because of a strike and picket line by 153 union members. This action violated the no-work-stoppage clause of the stabilization agreement of July 22, 1941 between construction trade labor unions and certain government contracting agencies. By December 8,1943, however, plaintiffs had assembled a full crew composed of some returning strikers and some newly hired workers who had been recruited by the plaintiffs themselves. On December 8,1943, the USES notified plaintiffs that it would make no further referrals of workers to the project pending settlement of the dispute. At no time *18 during the entire period of work in performance of contract 2124 did plaintiffs request the Regional Director of the War Manpower Commission to direct the USES to resume referrals pursuant to his authority to do so if he found, in the exercise of his discretion, that resumption of referrals was in the best interest of the war effort notwithstanding the existence of the dispute. The Regional Director was endowed with such authority but took no action regarding it as to work on contract 2124.
On December 10, 1943 a conciliation commissioner of the United States Conciliation Service was again assigned to attempt to resolve the dispute. Plaintiffs declined to meet with the commissioner personally, informing him through their superintendent that as far as they were concerned the dispute had been settled by the November 7,1943 oral agreement and that satisfactory progress was being made on the project, which was fully manned. The commissioner concluded that there was no possibility of his settling the dispute and advised the parties that he was reporting this to the Conciliation Service for certification to the appropriate agency for further review, which action would undoubtedly delay a decision until after work on the project had been fully or substantially completed. The controversy was referred to the appropriate agency but the matter was never resolved.
The history concerning work on the other three contracts is similar to that surrounding performance of contract 2124, and for present purposes only a few additional circumstances need be related. Initially, since the three remaining contracts were undertaken by plaintiffs on December 9, 1943, January 3, 1944, and February 29, 1944, it is obvious from the chronology that plaintiffs should have anticipated labor difficulties of the type experienced while performing contract 2124 when they committed themselves under the three remaining contracts. Furthermore, on July 1, 1944, due to the increasing shortage of skilled labor in the Tulsa area, a priority system was effected by the War Manpower Commission for the area whereby assignments of labor to specific projects were made dependent upon the priority rating assigned the project in accordance with the degree of impor *19 tance it bore to the effective prosecution, of the war effort. The evidence indicates that plaintiffs’ projects would not have received sufficiently high priority ratings to have warranted referrals of labor from the USES under this system, even had the USES been disposed to refer labor notwithstanding the existing labor disputes. Finally, with regard to the three remaining contracts, on August 23, 1944, plaintiffs appealed to the Eegional Director of the War Manpower Commission to exercise his discretionary authority to have the USES refer labor for work on plaintiffs’ projects notwithstanding the existing labor disputes. The Eegional Director sought the advice of his regional Labor-Management Advisory Committee, which voted almost unanimously to deny the appeal. The Eegional Director declined to exercise his authority contrary to the advice of the committee and on September 2,1944, notified plaintiffs that their appeal had been denied. Inasmuch as work on these three remaining contracts had been fully or substantially completed at the time plaintiffs finally made this appeal to the Eegional Director, there is serious doubt as to whether favorable action by the Eegional Director at that time would have made any appreciable difference in performance of the contracts.
It is plaintiffs’ position that the failure of the appropriate government agencies to resolve plaintiffs’ labor disputes, the refusal of the USES to refer labor to plaintiffs’ projects because of the existence of the labor disputes, and the failure of the Eegional Director of the War Manpower Commission to direct the USES to refer labor to plaintiffs’ projects notwithstanding the existence of the labor disputes, prevented plaintiffs from manning their projects on the four contracts with a sufficient number of skilled laborers. Plaintiffs aver that because the Government thus prevented them from securing an adequate labor force they suffered losses aggregating over $400,000 in the performance of the four contracts, for which the Government is legally and equitably obligated to reimburse them.
We do not agree with plaintiffs’ position. On the basis of the record before us we are not persuaded to alter our original conclusion that plaintiffs have established no legal right to recover the sums sought. Moreover plaintiffs' have *20 failed to prove any equitable obligation of the Government regarding their claims.
Initially, the Government undertook no obligations in any of the contracts that could in any way be construed as insuring plaintiffs sufficient labor to perform the contracts. The invitations for bids on each of the contracts were explicit in placing the bidders on notice that the contrary situation prevailed, for the invitations provided in part as follows:
Prospective offerers or their authorized agents are expected to * * * acquaint themselves with all available information, including local conditions and the availability of labor, and to make their own estimates of the * * * difficulties attending the execution of the work. Such estimates are expected to include a consideration of * * * all * * * contingencies. No allowance will be made by the Government for failure of an offerer to * * * estimate correctly the difficulties attending the execution [of the work] * * *.
Furthermore, each set of specifications, incorporated in each contract, contained the following provision:
* * * delays to scheduled progress of the contract work which may be caused * * * by labor difficulties shall be offset by the addition of sufficient plant and labor to enable the work to be completed within the contract period. * * *
It is difficult to conceive of language that could more clearly apprise the contractor of the burden of securing sufficient labor than that set out in the quoted portions. Yet in the face of these provisions and with full knowledge of the fact that their policies had resulted in labor disputes on previous projects in the same geographical area, plaintiffs actively sought the contracts. Having been thus apprised of their responsibilities under the contracts and the existing labor situation in the area, plaintiffs’ present attempt to shift the burden of their labor difficulties to the Government appears clearly misdirected. Inasmuch as plaintiffs had on a previous contract been denied referrals of labor by the USES in consequence of the existence of a labor dispute based on the identical labor policy, they cannot claim to have been surprised when the USES pursued the same course when labor disputes arose on the projects presently in issue.
*21 Plaintiffs do not challenge the legality of this policy, but rather allege that its application by the USES was discriminatory toward them. Plaintiffs contend that the Regional Director of the War Manpower Commission was motivated by prejudice toward them when he declined to exercise his discretion to direct the USES to resume labor referrals to plaintiffs’ projects notwithstanding the existence of the labor disputes. This allegation of prejudice is founded solely upon the hearsay statement of one individual who acknowledged in his testimony at trial that the basis of his statement was gossip. We cannot accept an allegation of prejudice or fraud against a responsible government official when based on anything less than evidence constituting clear and convincing-proof. Nichols & Co. v. United States, 156 Ct. Cl. 358. Certainly we cannot accept such an allegation when supported exclusively by admitted gossip. Moreover, as noted earlier, plaintiffs did not request the Regional Director to exercise this authority until August 23, 1944, when work was completed on contract 2124 and at least substantially completed on the other three contracts. Furthermore, this court can hardly find the Regional Director’s decision not to exercise this authority arbitrary when nine of the ten members of his advisory committee voted against his exercising it.
We find equally without merit plaintiffs’ contention that because the USES would not refer labor to work on plaintiffs’ projects due to the existence of labor disputes, the Government was obligated to settle those disputes. Initially, it should be noted that the fact that the USES declined to make labor referrals did not perforce deprive plaintiffs of adequate labor to perform their contractual obligations. Plaintiffs were free to recruit their own labor force subject only to two restrictions: (1) they could not employ “in-migrant” workers (i.e. workers who had come into the Tulsa area within the 30-day period immediately preceding the hiring) unless the “in-migrant” worker obtained a statement of availability from the Tulsa office of the USES, and (2) they could not hire a worker who during the 60-day period immediately preceding the hiring had been employed in an essential industry in the Tulsa area unless the worker had a *22 statement of availability from bis previous employer or tbe Tulsa office of tbe USES'. These regulations were designed to stabilize tbe labor situation to enable essential industry to best serve the war effort. Plaintiffs do not challenge their validity. Plaintiffs did recruit their own labor in the absence of referrals from the USES, and on occasion they did so in a manner proscribed by the regulations. While the labor may not have been as efficient as it would have been had the USES made referrals, we do not believe that the record would support a finding that whatever losses were incurred due to this uncertain diminution of efficiency resulted either legally or equitably from culpability attributable to the Government.
While it is true that the dispute was referred to government agencies charged with settling labor disputes, particularly the Wage Adjustment Board, it is difficult to perceive how the Government’s failure to settle plaintiffs’ labor dispute can mure to plaintiffs’ benefit. The powers of these agencies were limited. On one occasion when a conciliation commissioner of the United States Conciliation Service sought plaintiffs’ cooperation in resolving a dispute, plaintiffs proved uncooperative. Certainly plaintiffs were in at least as favorable a position as the Government to settle the dispute. Consequently, and in view of the provisions of the contract placing the burden of securing sufficient labor to perform their obligations squarely on the plaintiffs, we find no basis of liability in the Government’s action.
While this case comes before us pursuant to a resolution of the House of Representatives and not under the Lucas Act (60 Stat. 902, as amended; 62 S'tat. 992), which provided for the granting of equitable relief for losses sustained by certain contractors during World War II, it might be well to consider the standards prescribed by Congress in that statute for relief in cases similar to the one at bar. One of the standards prescribed in the Lucas Act was that any recovery of losses suffered by a contractor on an individual government contract should be limited to overall net losses which the contractor suffered on all of his World War II government contracts. Including the four contracts pres *23 ently before ns, plaintiffs had an overall net profit of at least $160,000 on all tiheir contracts with the United States during the World War II emergency period. Thus, pursuant to the standard prescribed by Congress for the granting of equitable relief under the Lucas Act, plaintiffs would not have been entitled to any recovery.
In summary we might add that while plaintiffs may have suffered losses due to inadequate labor in performance of the four contracts presently before us, whatever losses were thus incurred were attributable to a chain of circumstances including plaintiffs’ labor policies, aggressive union practices, and the general manpower shortage consequent to the industrial demands of the war effort, rather than to government dereliction or culpable inaction. What part the Government took in the ultimate situation resulted from the uniform application of reasonable policies required by the unique demands upon the nation in the effective prosecution of the war effort, from which plaintiffs benefited as citizens of the republic. Plaintiffs were aware of these policies, of union practices, and of the labor situation in the Tulsa area when they bid on the contracts. Whether or not they were justified in adhering rigidly to their labor policies, plaintiffs should have anticipated precisely the events as they ultimately developed. Plaintiffs were placed on notice when they bid on the contracts that the responsibility for securing adequate labor and resolving any labor problems that arose rested with them. We cannot now find any basis in law or in equity whereby the Government has become obligated to reimburse plantiffs for any losses suffered in the performance of the four contracts involved in this proceeding. We therefore recommend that no recovery be awarded.
This opinion along with the accompanying findings of fact will be reported to the House of Representatives pursuant to the resolution of July 3,1956, of the House of Representatives (H. Res. 531).
It is so ordered.
Laramore, Judge; Whitaker, Judge; and Jokes, Chief Judge, concur.
*24 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and arguments of counsel, makes findings of fact as follows:
1. (a) The plaintiffs, Eugene C. Ottinger and Clyde L. Ottinger, are brothers. During the period that is involved in these proceedings, the plaintiffs were partners engaged in the general construction business under the partnership name of Ottinger Brothers. They maintained their principal office and place of business in Oklahoma City, Oklahoma.
(b) From the date of the formation of the partnership in July 1940 through the year 1945, the plaintiffs undertook and performed contracts in Oklahoma, Arkansas, Texas, and Kansas for various agencies of the Federal Government and for municipal and State agencies. During the 1940-1945 period, the major portion of their work related to construction for agencies of the Federal Government. Some of this work they performed in the role of prime contractor, some as subcontractor, and some as joint venturer.
(c) It was the general labor policy of the plaintiffs to conduct their operations on an open-shop basis and to hire workmen solely on the basis of their qualifications, no distinction being made as between nonunion men and union members who applied for jobs.
2. Included among the contracts referred to in finding 1 (b) were four contracts (No. W-957-eng-2124, No. W-34-066-eng-94, No. W-34 — 066-eng-88, and No. W-34-066-eng-150) which the plaintiffs entered into with the Corps of Engineers, War Department (now Department of the Army), during the period 1943-1944 for the construction of portions of a flood control project known as the Tulsa-West Tulsa Levees. This project was designed to protect lowlands in the vicinity of Tulsa and West Tulsa, Oklahoma, from flood-waters of the Arkansas River. Located in these lowlands were highways, power lines, a railroad, a steel mill, oil storage tanks, stockyards, a plant manufacturing oil-field equipment, and other plants and facilities. Most of the plants located in this area were engaged in the performance of war *25 contracts for the Federal Government during the period that is involved in these proceedings.
3. On April 6, 1949, the plaintiffs filed with the Court of Claims an action against the United States, alleging that while they were engaged in the performance of the levee contracts referred to in finding 2, the War Manpower Commission refused to refer any workmen to them for this project because of the existence of a dispute between the plaintiffs and certain labor unions constituting the Alliance of Tulsa Building Trades, American Federation of Labor; that because of such refusal, it was necessary for the plaintiffs to prosecute the work with a labor force that was insufficient in number and inadequate in the necessary skills; that normal efficiency could not be obtained and the job could not be completed in the customary working time; and that, as a result, the plaintiffs were damaged through increased costs in the total amount of $472,427.74. Following a trial, the court on July 15, 1952, dismissed the plaintiffs’ petition. The court’s opinion (123 Ct. Cl. 23, 48) stated in part as follows:
Our conclusion is, then, that the War Manpower Commission’s general policy of refusing to furnish its services as an employment agency to employers who were involved in a labor dispute was not so arbitrary and unreasonable as to render it illegal, and remove it from the category of sovereign acts which do not constitute breaches of implied terms in the contracts of the United States. * * *
4. On March 31, 1955, there was introduced in the House of Representatives a bill (H.R. 5461) to “confer authority upon the Secretary of the Army to pay certain claims of Ottinger Brothers.” The bill contained the following sections (among others):
That the Secretary of the Army is authorized and directed to pay, out of appropriated moneys, the claims of Ottinger Brothers (a copartnership composed of E. C. Ottinger, of Forth Worth, Texas, and Clyde L. Ottinger, of Oklahoma City, Oklahoma) for compensation, not to exceed the sum of $400,000, Tor losses which were sustained during 1943 and 1944 in the performance of four contracts * * * entered into with the Corps of Engineers, United States Army, for the construction of *26 levees and pumping plants on the Arkansas River, and which were caused by the refusal of the United States Employment Service to make available the skilled labor required for such construction.
Seo. 2. Payment of such claims in an amount determined by the Secretary of the Army as representing losses sustained in the performance of said contracts as a result of the refusal of the United States Employment Service to make available the required skilled labor is hereby authorized notwithstanding any prior court decision or statute or regulation with respect to the legal liability of the United States, and notwithstanding the lapse of time or any statute of limitations.
5. On July 3,1956, the House of Representatives adopted a resolution (H. Res. 531) stating in part as follows:
Resolved, That the bill (H.R. 5461) entitled “A bill to confer authority upon the Secretary of the Army to pay certain claims of Ottinger Brothers’^ together with the accompanying papers, notwithstanding the statute of limitations, be referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House of Representatives, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
6. Pursuant to a new petition filed by the plaintiffs on October 3,1956, and an answer filed by the United States on February 1, 1957, trial sessions were held in Washington, D.C., on January 6, 1958, in Kansas City, Missouri, and Tulsa, Oklahoma, during the period February 5-20, 1958, and in Washington, U.C., on April 22-23, June 5, September 9-10, and October 20, 1958. The parties completed the submission of their requested findings of fact and related material on June 27,1960.
7. The flood control project mentioned in finding 2 consisted principally of 10 to 11 miles of earthen levee or embankment on the north (or left) bank of the Arkansas River in Oklahoma, extending from Sand Springs toward Tulsa, *27 and 5 to 6 miles of levee on the south (or right) bank of the river, protecting West Tulsa. The levees were divided into three sections, designated as Sections “A,” “B,” and “C.” Section “A” involved the construction of 4 to 5 miles of the levee on the left (or north) bank of the river, starting at the upstream (or west) end of the levee near Sand Springs and extending toward Tulsa; Section “B” included the remainder of the levee on the left bank; and Section “C” involved the construction of the levee on the right (or south) bank of the liver. In addition to the earthen levees, the project called for the construction of numerous related items and appurtenant facilities, including floodway structures, pumping plants, culverts, and bridges, and the relocation or alteration of existing pipelines, roads, and railroads. Bids were invited and contracts were awarded by the Corps of Engineers on separate portions of the work. All work on the project was under the supervision of the District Engineer, Corps of Engineers, at Tulsa.
8. (a) The labor supply in the Tulsa area consisted principally of union members; and the plaintiffs, at the time when they entered into the first of the four contracts for the performance of work on the Tulsa-West Tulsa Levees, were experiencing trouble with labor unions in the Tulsa area because of the plaintiffs’ open-shop labor policy. At the time mentioned in this finding, the plaintiffs were engaged in the performance of a contract with the Corps of Engineers for the construction of what was known as a compass swinging-base at the Air Force Modification Center in Tulsa. Other contractors engaged in the construction of the Modification Center at the same time were operating on a closed-shop basis and used only union labor. On August 25, 1943, while the plaintiffs were engaged in the construction of the compass swinging base, the Construction and General Laborers’ Union of Tulsa notified the Tulsa office of the United States Employment Service, an agency of the War Manpower Commission (see finding 49), that the plaintiffs were “unfair and we now have a labor dispute on the job.” (The United States Employment Service will usually be referred to hereafter in the findings as “the Employment Service.”) On August 31, 1943, a notice was filed with the Employment *28 Service by tbe Alliance of Tulsa Building Trades, American Federation of Labor, “that a labor dispute exists,” and the Employment Service was requested by the Alliance not to furnish any workmen to the plaintiffs’ compass swinging base project until the dispute had been settled. On September 1, 1943, a similar notice of the existence of a “labor dispute” was received by the Employment Service from the Carpenters’ Local Union No. 943 of Tulsa. The basis for each of these notices was the refusal of the plaintiffs to agree to operate on a closed-shop basis.
(b) On August 28,1943, after the filing of the first of the dispute notices mentioned in paragraph (a) of this finding, the plaintiffs requested the Employment Service to furnish certain laborers for their work on the compass swinging base, but no workmen were referred by the Employment Service to the plaintiffs in response to that request. The reason for the refusal of the Employment Service to make referrals of labor to the plaintiffs for the compass swinging base job was a War Manpower Commission regulation which prohibited a local office of the Employment Service from referring labor to an employer during the existence of a labor dispute, unless directed to do so by the Regional Director of the War Manpower Commission on the basis of a determination that it would be “in the best interest of the war effort” to make labor referrals to the particular employer notwithstanding the existence of the labor dispute. (See finding 50.)
(c) Despite the labor dispute notices that were filed against the plaintiffs, as indicated in paragraph (a) of this finding, and the refusal of the Employment Service to refer laborers to the plaintiffs for their work on the compass swinging base, the plaintiffs were able to obtain an adequate labor supply through their own hiring efforts, and the compass swinging base was completed by the plaintiffs without any particular difficulty. Under the employment stabilization program of the War Manpower Commission which was then in effect for the Tulsa area, the plaintiffs were not subject to any governmental restrictions on the recruitment of labor through their own efforts, except that (1) they could not employ an “in-migrant” (i.e., a workman who had come into the Tulsa area during the 30-day period immediately *29 prior to tbe hiring) unless tbe “in-migrant” obtained a statement of availability from tbe Tulsa area office of tbe Employment Service, and (2) tbe plaintiffs could not bire a workman wbo, during tbe 60-day period immediately prior to tbe biring, bad been employed in an essential industry within tbe Tulsa area unless tbe workman had a statement of availability from bis previous employer or from tbe Tulsa area office of tbe Employment Service.[1]
(d) Tbe plaintiffs’ contract with tbe Corps of Engineers for tbe construction of tbe compass swinging base is not directly involved in tbe present proceedings.
9. At tbe time mentioned in finding 8, and at all other times material to these proceedings, tbe Employment Service was operating under tbe control of tbe War Manpower Commission, which was represented by an area director in Tulsa and a regional director in Kansas City, Missouri. (See finding 49.)
10. (a) The earliest of tbe four contracts involved in these proceedings was No. W-957-eng-2124, which provided for tbe construction of Section “A” of the levee, together with appurtenant related work. (This contract will usually be referred to hereafter in tbe findings as “contract 2124.”) Specifications and invitations for bids on this segment of tbe flood control project were issued by tbe Corps of Engineers On August 25,1943; bids were opened on September 14,1943; a letter notice of award was issued by tbe Corps of Engineers to tbe plaintiffs on September 22,1943; and this was accepted by tbe plaintiffs on September 24, 1943. Tbe subsequently executed formal written contract was dated September 22, 1943. This contract called for tbe completion of 49 separate items of work, most of which were at unit prices on estimated quantities. Tbe total estimated contract price was $406,108.20. The scheduled contract completion date was April 15,1944.
*30 (b) Work under contract 2124 was commenced by the plaintiffs on October 6, 1943. Tire small labor force needed by the plaintiffs at the initial stage of this job was recruited by the plaintiffs through their own efforts, without the assistance of the Employment Service.
11. On October 6, 1943, when the plaintiffs commenced work under contract 2124, the Alliance of Tulsa Building Trades notified the Employment Service that its affiliated crafts were having “labor difficulties” with the plaintiffs on the levee job. The reasons stated by the Alliance for the reported “labor difficulties” were that the plaintiffs had refused to meet with representatives of the Alliance to negotiate a labor agreement, that the plaintiffs had employed for the levee job a number of “in-migrants” who did not have the required statements of availability, and that there was “trouble” between the plaintiffs’ nonunion employees and union men employed by other contractors on the Tulsa-West Tulsa Levees.
12. On October 9, 1943, the plaintiffs requested the Employment Service to furnish seven common laborers for work on the levee project beginning October 12, 1943. This was the first request made by the plaintiffs for the assistance of the Employment Service in obtaining labor for the levee job. In response to this request, the Employment Service informed the plaintiffs that labor could not be referred to them for work on the levee project until such time as the Employment Service received notice that the reported labor dispute relative to the levee job had been settled, or until it had been determined by the Employment Service that a labor dispute did not actually exist.
13. On October 14, 1943, the Alliance of Tulsa Building Trades filed with the Area Director of the War Manpower Commission a formal notice that a labor dispute existed with the plaintiffs on the levee job. In filing this notice, the Alliance alleged that the plaintiffs refused to employ union workers, and that the plaintiffs were importing workmen from outside the State of Oklahoma when plenty of workers were available in the immediate vicinity.
14. An investigation was made by the Area Director of the War Manpower Commission relative to the alleged im *31 proper employment of “in-migrants” by the plaintiffs. It was determined as a result of the investigation that 38 of the plaintiffs’ employees on the levee job had been employed as “in-migrants” without the required statements of availability ; and the plaintiffs were informed that they would have to discharge these 38 employees.
15. Following efforts by various persons, including a commissioner of conciliation from the United States Conciliation Service, Department of Labor, to aid in settling the controversy between the plaintiffs and the Alliance of Tulsa Building Trades relative to the levee job, an oral agreement for the settlement of the controversy was reached on or about November 7, 1943, between the plaintiffs and the Alliance. As part of this agreement, the plaintiffs agreed that on and after December 1, 1943, they would employ only union labor for the levee job; and the Alliance agreed to withdraw — ■ and it did withdraw — the labor dispute notices which had previously been filed with the Employment Service and with the Area Director of the War Manpower Commission relative to the plaintiffs’ levee job. As an incident of this agreement, the Employment Service granted statements of availability to the 38 “in-migrants” whom the plaintiffs had employed without the required statements of availability, and permitted these persons to continue in the plaintiffs’ employ.
16. During a period of several weeks immediately following the settlement on November 7, 1943, of the controversy between the plaintiffs and the Alliance of Tulsa Building Trades, the plaintiffs submitted to the Employment Service requests for workmen to use on the levee project, and referrals of labor were made by the Employment Service to the plaintiffs in response to these requests. By the end of November 1943, the plaintiffs’ working force on the levee job had been built up to a total of approximately 173 workmen, most of whom were union members.
17. In the latter part of November 1943, a difference arose between the plaintiffs and the Alliance of Tulsa Building Trades over the question whether, under the oral agreement of November 7, the nonunion workmen who had already been employed by the plaintiffs for work on the levee project would or would not be required to join a union as a prerequi *32 site to continuing in the plaintiffs’ employ after December 1, 1943. The plaintiffs contended that the requirement under the agreement of November 7 that they would employ only union labor for the levee job on and after December 1,1943, was applicable only to new employees hired on or after December 1; that it was discretionary with the nonunion workers already employed by the plaintiffs whether they would or would not join a union; and that those who elected not to become union members would not be discharged by the plaintiffs on that account. The Alliance, on the other hand, contended that under the agreement of November 7 only union members could be in the plaintiffs’ employ on and after December 1, 1943, which meant that nonunion workmen previously employed by the plaintiffs would have to become union members as of December 1 or be discharged by the plaintiffs.
18. The misunderstanding between the plaintiffs and the Alliance of Tulsa Building Trades mentioned in finding 17 had not been resolved by December 1, 1943. On that date, the Alliance wrote a letter to the Employment Service, stating that a labor dispute existed between the plaintiffs and labor unions constituting the Alliance. The labor dispute notice asserted that the dispute had arisen because of the plaintiffs’ failure to carry out an agreement previously made with the Alliance to unionize the levee job by December 1, 1943. The Employment Service was requested not to refer labor to the plaintiffs’ levee job.
19. On December 6,1943, all the union men who had been employed by the plaintiffs for work on the levee project, 153 in number, left the job on strike, and established a picket line.[2] The plaintiffs’ nonunion employees, 20 in number, remained on the job.
20. The strike on the plaintiffs’ levee project under contract 2124 occurred about noon on December 6,1943, and the job was completely shut down for the remainder of that day. By the next morning, a few of the men who had gone out on strike returned to work; and they, together with the plain *33 tiffs’ nonstriking employees, made up a skeleton crew, so that the plaintiffs were able to resume some phases of the work. By December 8,1943, or at least within a few days after that date, the plaintiffs had assembled a full crew. This included some additional strikers who had returned to the job and some new employees whom the plaintiffs had recruited to replace striking workmen.
21. (a) On or about December 8, 1943, the Employment Service notified the plaintiffs that the Employment Service would not refer any additional labor to the plaintiffs for their levee job pending the settlement of the labor dispute. Thereafter, all requests submitted by the plaintiffs to the Employment Service for workmen to use under contract 2124 were refused or ignored by the Employment Service.
(b) The plaintiffs did not at any time during the performance of the work under contract 2124 submit to the Regional Director of the War Manpower Commission in Kansas City any request that he exercise his authority to direct the Employment Service to resume labor referrals to the plaintiffs for the levee job notwithstanding the existence of the controversy between the plaintiffs and the Alliance of Tulsa Building Trades, on the ground that such labor referrals to the plaintiffs would be in the best interest of the war effort.
22. The Regional Director of the War Manpower Commission in Kansas City, who had been informed of the situation by the area director in Tulsa, sent a telegram on December 10, 1943, to the Director of the United States Conciliation Service, Department of Labor, in Washington, D.C., stating in part as follows:
* * * Would appreciate statement from you whether * * * making referrals [of labor by the Employment Service to the plaintiffs] would interfere with negotiations or delay progress in adjustment of dispute. * * *
23. On December 10,1943, the Office of the Chief of Engineers addressed a communication to the War Manpower Commission in Washington, D.C., requesting that the policy of the Employment Service in refusing to refer labor to the plaintiffs for their levee job be discontinued. The Office of the Chief of Engineers stated in this connection that such *34 policy appeared to be in furtherance of union attempts to force a nonunion contractor to operate a closed or union shop.[3]
24. (a) At the request of, and upon the basis of information furnished by, the Office of the Chief of Engineers, a telegram was sent to the Alliance of Tulsa Building Trades on December 11, 1943, by the Chairman of the Board of Be-view in Washington, D.C., stating that the matter of the installation of the picket line and the leaving of the job by the plaintiffs’ union employees had been brought to the chairman’s attention, and that such action constituted a violation of the no-work-stoppage clause of the stabilization agreement of July 22, 1941, between the labor unions operating in the building and construction industry, on the one hand, and certain Government contracting agencies (including the War and Navy Departments), on the other hand. In this telegram, the Alliance was directed to discontinue the picket line and to have the union men resume work pending a peaceful settlement of the dispute. The Alliance was informed that, unless it obeyed this directive, the matter would be referred to the Board of Beview for action.
(b) The Alliance did not comply with the directive contained in the telegram of December 11, 1943,[4] and no action was taken by the Board of Beview relative to the matter.
(c) The Board of Beview had been established by the Office of Production Management for the purpose of administering the wage stabilization agreement of July 22, 1941, referred to in paragraph (a) of this finding. That agreement provided for uniform overtime rates and uniform shift pay on all national defense projects; and it further provided that wage rates paid at the start of a project would continue until the completion of the project, or for a year. It was agreed that there would be no stoppage of work for any cause, and that all grievances and disputes should be settled *35 by conciliation and arbitration. The Board of Eeview was authorized to interpret the provisions of the agreement and to adjust disputes arising under it.
(d) As of December 11, 1943, when the telegram mentioned in paragraph (a) of this finding was sent by the Chairman of the Board of Eeview to the Alliance of Tulsa Building Trades, the activities of the Board of Eeview had become relatively minor. By that time, labor disputes in the building and construction industry, except those narrowly relating to the agreement of July 22,1941, were (as indicated in subsequent findings) being referred to the Wage Adjustment Board at the national level.
25. On December 12, 1943, a commissioner of conciliation from the Department of Labor arrived in Tulsa to investigate the controversy between the plaintiffs and the Alliance of Tulsa Building Trades relative to the levee job.
26. On December 13, 1943, the United States Conciliation Service acknowledged the telegram of December 10 from the Eegional Director of the War Manpower Commission in Kansas City (see finding 22), and informed the regional director that a commissioner of conciliation had been assigned to the dispute.
27. The commissioner of conciliation conducted an investigation and conferred with numerous interested persons. Though he sought plaintiffs’ cooperation towards resolving the dispute, plaintiffs declined to meet personally with the commissioner, informing him through their superintendent that as far as they were concerned the dispute had been settled by the oral agreement of November 7, 1943, and that satisfactory progress was being made on the project which was fully manned. The commissioner finally concluded that because of the sharp difference of opinion between plaintiffs and the Alliance of Tulsa Building Trades as to what the oral agreement of November 7, 1943 had actually been with respect to the retention by plaintiffs of nonunion employees after December 1, 1943, there was no possibility of his settling the dispute. Accordingly, on December 17, 1943, he referred the matter to the Director of the United States Conciliation Service.
*36 28. Under the date of December 30, 1943, the Director of the United States Conciliation Service and the Secretary of Labor certified the matter of the controversy between the plaintiffs and the Alliance of Tulsa Building Trades to the National War Labor Board pursuant to paragraph 3 of Executive Order 9017 (7 F.B. 237) and Section 7(a) (1) of the War Labor Disputes Act (57 Stat. 163, 166).[5] The certification stated that:
* * * there is hereby certified to the Board for appropriate action a labor dispute * * * which might interrupt work which contributes to the effective prosecution of the war and may lead to substantial interference with the war effort and which cannot be settled by collective bargaining or conciliation.
29. (a) By means of a communication dated January 12, 1944, the National War Labor Board informed the plaintiffs that the matter of the plaintiffs’ controversy with the Alliance of Tulsa Building Trades had been referred to it, and that it, in turn, had referred the matter to the Wage Adjustment Board. The communication stated in part as follows:
The functions of the National War Labor Board are carried out on a decentralized basis in order to expedite the handling of all cases. * * * The above case has been referred to Wage Adjustment Board, Boom 1109, Department of Labor Building, Washington, D.C.
You will be notified by that office regarding the procedure to be followed in this case and it is requested that all inquiries regarding this case be directed thereto.
(b) The National War Labor Board had delegated certain of its functions in connection with the building and construction industry to the Wage Adjustment Board (see finding 48). These included (according to the prevailing view in the National War Labor Board and in the Wage Adjustment Board) jurisdiction over all labor disputes in the building and construction industry.
(c) The plaintiffs never received any further communication concerning this matter from the National War Labor Board or from the Wage Adjustment Board after the communication of January 12, 1944; and the plaintiffs never *37 directed any inquiry concerning the matter to the National War Labor Board or to the Wage Adjustment Board.
30. The second of the contracts involved in the present proceedings was No. W-3N-066-eng-94, which covered the construction of a concrete floodway structure and appurtenant related work at Blackboy Creek, a tributary of the Arkansas Biver. (This contract will usually be referred to hereafter in the findings as “contract 94.”) Specifications and invitations for bids relative to this contract were issued by the Corps of Engineers on November 12,1943 (which was shortly after the supposed settlement on November 7 of the initial dispute between the plaintiffs and the Alliance of Tulsa Building Trades in connection with contract 2124); bids were opened on November 29, 1943; a letter notice of award was issued by the Corps of Engineers to the plaintiffs on December 6,1943 (the day on which the plaintiffs’ work under contract 2124 was shut down by the strike of their union employees); and this was accepted by the plaintiffs on December 9, 1943. The subsequently executed formal written contract was dated December 6,1943. This contract involved 44 separate items of work, most of which were at unit prices on estimated quantities. The total estimated contract price was $228,039.85. The completion date fixed in the contract was May 1,1944.
31. The third contract between the plaintiffs and the Corps of Engineers relative to the construction of the Tulsa-West Tulsa Levees was No. W-34-066-eng-88, which called for the construction of three pumping plants and related work on Section “A” of the levee, the pumps and motors being-furnished by the Government. (This contract will usually be referred to hereafter in the findings as “contract 88.”) Specifications and invitations for bids on this contract were issued by the Corps of Engineers on December 13, 1943 (which was after the plaintiffs had been notified by the Employment Service that the latter would not refer or furnish any laborers to the plaintiffs for work under contract 2124 so long as the dispute existed between the plaintiffs and the Alliance of Tulsa Building Trades) ; bids were opened on December 31, 1943; and the formal written contract was dated January 3, 1944. This contract involved 56 separate *38 items of work, at both unit prices on estimated quantities and lump-sum prices, the total estimated contract price being $129,147.85. The final date fixed in the contract for the completion of the work was August 15,1944.
32. On January 8,1944, the plaintiffs wrote a letter to the manager of the Tulsa office of the Employment Service, informing him that two additional levee contracts (Nos. 94 and 88) had been awarded to the plaintiffs by the Corps of Engineers, and inquiring whether the Employment Service would honor requests from the plaintiffs for labor to be used in connection with the work under the additional contracts. The Employment Service responded on January 13, 1944, and stated that labor would be supplied to the plaintiffs for work in connection with the new contracts, in the absence of the filing of a labor dispute notice respecting such work. The Employment Service stated that such labor could not be used by the plaintiffs for work under contract 2124 (as to which a labor dispute notice had already been filed). Thereafter, over a period of approximately 2 weeks, the Employment Service responded to requests from the plaintiffs by referring some laborers to the plaintiffs for work under contracts 94 and 88.
33. (a) On January 26, 1944, the Alliance of Tulsa Building Trades filed with the Employment Service a labor dispute notice that was applicable to all of the plaintiffs’ operations on the Tulsa-West Tulsa Levees. Thereafter, the Employment Service declined to refer any laborers to the plaintiffs for the performance of work in connection with the plaintiffs’ several levee contracts, pending the settlement of the controversy between the plaintiffs and the Alliance of Tulsa Building Trades; and it was necessary for the plaintiffs to perform such contracts with workmen recruited through their own efforts and without any assistance from the Employment Service. This recruitment of workmen by the plaintiffs was handled through the hiring of men who came to the job site of their own volition or who were brought there as acquaintances, friends, or relatives of persons already employed by the plaintiffs, through the solicitation of workers by means of newspaper advertisements, and through other efforts which the plaintiffs diligently made to man *39 their jobs and keep the work going regardless of the difficulties encountered. The only restrictions imposed by the Government on the plaintiffs in the recruitment of labor (at least up to July 1, 1944) were those mentioned in finding 8(c).
(b) The plaintiffs did not, for a period of approximately 7 months after January 28, 1944, submit to the Regional Director of the War Manpower Commission in Kansas City any request that he exercise his authority to direct the Employment Service to resume labor referrals to the plaintiffs for their levee jobs notwithstanding the existence of the controversy between the plaintiffs and the Alliance of Tulsa Building Trades, on the ground that such labor referrals to the plaintiffs would be in the best interest of the war effort.
34. In a letter dated February 19, 1944, and addressed to a Co-Chairman of the Wage Adjustment Board, the Office of the Chief of Engineers took the position that labor dispute cases arising in connection with Federal construction, such as the one between the plaintiffs and the Alliance of Tulsa Building Trades, were not within the jurisdiction of the Wage Adjustment Board but were within the jurisdiction of the Board of Review under the wage stabilization agreement of July 22, 1941. It was recommended by the Office of the Chief of Engineers that the Wage Adjustment Board notify the Alliance of Tulsa Building Trades that the Wage Adjustment Board had no jurisdiction over the matter and would be unable to take any action concerning it. It was the prevailing view in the Wage Adjustment Board, however, that it had jurisdiction over all labor disputes arising in the building and construction industry, irrespective of whether such disputes arose in connection with Federal construction or private construction.
35. (a) The last of the contracts involved in the present proceedings was No. W-3A-066-eng-150, which covered the construction of two pumping plants and related work on Section “B” of the levee, with Government-furnished pumps and motors. (This contract will usually be referred to hereafter in the findings as “contract 150.”) Specifications and invitations for bids on this contract were issued on January 31, 1944; bids were opened on February 19, 1944; and the *40 formal written contract was dated February 29,1944. This contract involved 50 separate items of work, at botb unit prices on estimated quantities and lump-sum or job prices, the total estimated contract price being $130,403. The date fixed in the contract for the final completion of the work was September 15,1944.
(b) This contract was performed wholly with laborers recruited by the plaintiffs themselves, without any assistance from the Employment Service.
36. On March 6, 1944, the Wage Adjustment Board sent a telegram to the Begional Director of the War Manpower Commission in Kansas City, stating that referrals of labor by the Employment Service to the plaintiffs’ levee jobs would not interfere with consideration of the case by the Wage Adjustment Board. (See finding22.)
37. The matter of the controversy between the plaintiffs and the Alliance of Tulsa Building Trades was considered by the Wage Adjustment Board at meetings held on March 30 and June 7, 1944. On each occasion, the Wage Adjustment Board concluded that the matter should be “continued open.” No formal decision relative to this matter was ever rendered by the Wage Adjustment Board.
38. (a) Effective July 1, 1944, the War Manpower Commission adopted for certain regions, including the region of which the Tulsa area was a part, a priority referral program which provided (among other things) that employers could hire new employees only upon the basis of referrals by the respective local offices of the Employment Service. This program was adopted because there was a nationwide decline during the first 6 months of 1944 in the quantity and quality of the available manpower, and the demand for manpower materially exceeded the supply. The Tulsa area was affected by this situation. Skilled workmen in many classifications, including operators of construction equipment, were unavailable in the Tulsa area, for all practical purposes, and the Employment Service in the Tulsa area was unable to meet the demands of its most critical manpower claimants for such workmen.
(b) In making referrals of labor under the priority referral program after July 1, 1944, the local offices of the *41 Employment Service did so on the basis of priorities assigned to the employers requesting referrals. An employer’s relative priority was determined upon the basis of how directly his work was connected with the war effort, in the opinion of committees that were set up under the priority referral program.
(c) The evidence in the record warrants an inference that the plaintiffs’ levee jobs probably would not have had a sufficiently high priority to obtain referrals of labor from the Employment Service after July 1, 1944, even if the Employment Service had otherwise been willing to make such referrals to the plaintiffs.
39. (a) In a communication dated August 23, 1944, the plaintiffs appealed to the Regional Director of the War Manpower Commission in Kansas City from the refusal of the Employment Service to refer labor to the plaintiffs for their levee jobs. The regional director submitted to the regional Management-Labor Committee a request for an advisory opinion on the question whether referrals of labor to the plaintiffs’ levee jobs should be resumed by the Employment Service notwithstanding the existence of a labor dispute. The regional Management-Labor Committee recommended that referrals of labor to the plaintiffs should not be resumed. Thereupon, the regional director on or about September 2, 1944, acted adversely on the plaintiffs’ appeal. In his action, the regional director stated in part as follows:
The Regional Director, after considering the advice of the Regional War Manpower Committee and other information, determines that in the best interest of the war effort, referrals should not be resumed.
(b) As of September 2, 1944, the plaintiffs had already completed the work under contract 2124, and they were far along in the performance of the work under their other levee contracts. (See finding 40.) Therefore, even if the regional director had acted favorably on the plaintiffs’ appeal, it would not have made any substantial difference in the plaintiffs’ operations under the levee contracts.
40. (a) The working force which the plaintiffs assembled in the various ways previously mentioned was sufficient to *42 enable the plaintiffs to complete their four levee contracts, as indicated in the succeeding paragraphs of this finding.
(b) The date fixed in contract 2124 for the completion of the work under that contract was April 15, 1944. The work under this contract was finally completed on May 27, 1944. Seven modifications or change orders were issued by the Corps of Engineers under contract 2124, but none of them provided for an extension of time. These change orders were accepted by the plaintiffs without objection. A total consideration of $413,105.47 was paid to the plaintiffs by the Corps of Engineers in accordance with contract 2124.
(c) The initial date fixed in contract 94 for the completion of the work under this contract was May 1,1944. Six modifications or change orders, including extensions of time for a total of 32 days, were issued by the Corps of Engineers under this contract, and were accepted by the plaintiffs without objection. The work under contract 94 was completed by the plaintiffs on September 23,1944. The total consideration paid to the plaintiffs by the Corps of Engineers under this contract was $229,519.03.
(d) The final date fixed in contract 88 for the completion of the work under this contract was August 15, 1944. Six modifications or change orders were issued under this contract by the Corps of Engineers, but none of them provided for an extension of time. These change orders were accepted by the plaintiffs without objection. The work under contract 88 had been substantially completed by September 23, 1944, and it was finally completed on December 23, 1944. The total consideration paid to the plaintiffs by the Corps of Engineers under contract 88 was $127,974.16.
(e) The date fixed in contract 150 for the final completion of the work under this contract was September 15,1944. Two modifications or change orders were issued by the Corps of Engineers under this contract, but neither of them provided for an extension of time. These change orders were accepted by the plaintiffs without objection. The work under contract 150 had been substantially completed by September 23, 1944, and all work under this contract was finally completed on December 30,1944. The total consider *43 ation. paid to the plaintiffs by tbe Corps of Engineers under this contract was $126,193.52.
41. (a) The plaintiffs incurred losses in the performance of the four levee contracts that are involved in the present proceedings. These losses are indicated in the following table:

Contract Amount of loss

2124_ $48,816.02
94_ 58,044. 69
88_ 25, 897.87
150_ 50,493. 92
Total_$183,252.50
(b) The costs allowed in the determination of the losses set out in paragraph (a) of this finding included all direct costs of contract performance, direct expenditures for all labor and materials required for equipment repairs, insurance and bonds, an allocation of equipment depreciation, and an allocation of home-office overhead.
42. (a) The losses referred to in finding 41 were attributable primarily to the delays in the completion of the work under the respective contracts (see finding 40). Such delays were caused in part by the inefficiency of the plaintiffs’ labor force, in part by bad weather, and in part by difficulties encountered by the plaintiffs in obtaining necessary materials on account of the low priorities assigned to the plaintiffs’ levee jobs. The evidence in the record does not permit an accurate allocation of the plaintiffs’ losses under the levee contracts to be made among the several causes mentioned in this finding, although the evidence indicates that the most important factor was the inefficiency of the plaintiffs’ labor force.
(b) It is reasonable to infer that the plaintiffs’ labor force on the levee jobs would have been somewhat more efficient, on the whole, than it actually was if the Employment Service had not refused to make referrals of labor to the plaintiffs for work under contract 2124 after December 8, 1943, or for work under the plaintiffs’ other levee contracts after January 26, 1944. However, there was an acute shortage of skilled workers (including construction equipment operators) available to the Employment Service in the Tulsa area *44 for referrals to employers during the period in question, and there was a great demand for such workers. It is impossible to ascertain the actual extent to which the level of efficiency in the plaintiffs’ working force would have been higher than it was if the Employment Service had not refused to make referrals to the plaintiffs’ levee jobs, or to calculate the extent to which such higher level of efficiency would have affected the plaintiffs’ profit or loss experience in performing the four levee contracts.
(c) Labor dispute notices similar to those involved in the present proceedings were frequently received by local offices of the Employment Service during the war years with respect to persons performing contracts with the Government. It was the uniform policy of the Employment Service throughout the United States to refuse to furnish labor to a contractor in such a situation so long as the labor dispute was pending, unless the [Regional Director of the War Manpower Commission in the particular region determined that the Employment Service should make referrals of labor to the contractor notwithstanding the existence of the dispute, because such referrals would be in the best interest of the war effort. The Employment Service accorded the plaintiffs the same sort of treatment that it accorded all other Government contractors in similar situations.
43. The plaintiffs, by means of a letter dated October 9, 1944, and addressed to the District Engineer of the Corps of Engineers at Tulsa, filed a claim for the damages allegedly sustained as the result of the refusal of the Employment Service to refer labor to the plaintiffs’ levee jobs. The plaintiffs’ claim was referred to the War Department Board of Contract Appeals, which held that it was without authority to consider the claim.
44. (a) The plaintiffs subcontracted portions of the work under each of the four contracts involved in this case. The plaintiffs have not paid to their subcontractors any amounts in excess of the amounts initially agreed upon between the respective parties, and the plaintiffs do not assert in these proceedings any claims for or on behalf of any of their subcontractors.
*45 (b) Of the 49 separate items of work under contract 2124, the plaintiffs performed 5 items (generally involving work incident to excavating, moving, and placing earth as part of the levee), and the remaining 44 contract items were performed by subcontractors. The total sum of $418,105.47 which was paid to the plaintiffs under this contract consisted of $204,520.26 for work directly performed by the plaintiffs and of $208,585.11 for the work performed by subcontractors. The plaintiffs paid their subcontractors for the work performed by them under this contract the total amount of $188,980.70, or $19,604.41 less than the amount which the plaintiffs received from the Corps of Engineers for the items of work performed by the subcontractors.
(c) The plaintiffs performed 41 of the separate items of work provided for in contract 94, and 3 of the items under this contract were performed by subcontractors. The total amount of $229,519.03 which the plaintiffs received under this contract consisted of $209,162.47 for work directly performed by the plaintiffs and of $20,366.56 for items of work which were accomplished by subcontractors. The plaintiffs paid their subcontractors $16,992.32, or $3,374.24 less than the amount received by the plaintiffs from the Corps of Engineers for the items of work that were performed by the subcontractors.
(d) The plaintiffs performed 42 of the separate items of work under contract 88, and subcontractors performed 14 of the items. The total amount of $137,974.16 which the plaintiffs received from the Corps of Engineers under this contract consisted of $107,204.20 for the items of work performed by the plaintiffs and of $30,769.96 for the items of work performed by subcontractors. The plaintiffs paid their subcontractors $27,487.79, or $3,282.17 less than the amount that the plaintiffs received from the Corps of Engineers for the subcontracted items.
(e) The plaintiffs performed 46 of the separate items of work under contract 150, and subcontracted 4 items, in whole or in part. The total of $126,193.52 which the plaintiffs received from the Corps of Engineers under this contract consisted of $117,430.88 for items of work performed by the *46 plaintiffs and of $8,762.64 for items accomplished by subcontractors. The plaintiffs paid their subcontractors a total of $8,256.12, or $506.52 less than the amount which the plaintiffs received from the Corps of Engineers for the subcontracted items.
45. (a) Each of the invitations for bids leading up to the four contracts that are involved in the present proceedings contained a provision stating in part as follows:
Prospective offerers or their authorized agents are expected to * * * acquaint themselves with all available information, including local conditions and the availability of labor, and to make their own estimates of the * * * difficulties attending the execution of the work. Such estimates are expected to include a consideration of * * * all * * * contingencies. No allowance will be made by the Government for failure of an offerer to * * * estimate correctly the difficulties attending the execution [of the work] * * *.
(b) Each set of specifications forming part of the contracts involved in these proceedings contained a provision stating in part as follows:
* * * delays to scheduled progress of the contract work which may be caused * * * by labor difficulties shall be offset by the addition of sufficient plant and labor to enable the work to be completed within the contract period. * * *
(c) Each of the contracts involved in these proceedings required the plaintiffs to furnish the materials (except as otherwise provided) and to perform the work in strict accordance with the specifications, schedules, and drawings, for the consideration specified in the respective contracts.
(d) Each of the contracts contained an article which provided for the granting of extensions of time by the contracting officer (or by the Secretary of War upon appeal to him by the plaintiffs from an adverse determination by the contracting officer):
* * * because of any delays in the completion of the work due to causes beyond the control and without the fault or negligence of the Contractor, including, but not restricted to acts of God, or of the public enemy, acts of *47 the Government (including, but not restricted to any preference, priority or allocation order), acts of another Contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes. * * *
(e) None of the contracts contained any provision relative to the furnishing of labor to the plaintiffs by the Employment Service.
46. The National War Labor Board was established by Executive Order No. 9017, dated January 12, 1942 (7 F.E. 237), which provided in part as follows:
WHEEEAS by reason of the state of war * * * the national interest demands that there shall be no interruption of any work which contributes to the effective prosecution of the war; and
WHEEEAS as a result of a conference of representatives of labor and industry which met at the call of the President on December 17, 1941, it has been agreed that for the duration of the war there shall be no strikes or lockouts, and that all labor disputes shall be settled by peaceful means, and that a National War Labor Board be established for the peaceful adjustment of such disputes:
NOW, THEEEEOEE, * * * it is hereby ordered:
1. There is hereby created in the Office for Emergency Management a National War Labor Board, hereinafter referred to as the Board. * * *
H» ^ íj»
3. The procedures for adjusting and settling labor disputes which might interrupt work which contributes to the effective prosecution of the war shall be as follows: (a) The parties shall first resort to direct negotiations or to the procedures provided in a collective bargaining agreement, (b) If not settled in this manner, the Commissioners of Conciliation of the Department of Labor shall be notified if they have not already intervened in the dispute, (c) If not promptly settled by conciliation, the Secretary of Labor shall certify the dispute to the Board * * *. After it takes jurisdiction, the Board shall finally determine the dispute, and for this purpose may use mediation, voluntary arbitration, or arbitration under rules established by the Board.
*48 47. (a) Section 7(a) of the War Labor Disputes Act of June 25,1943 (57 Stat. 163,166) provided in part as follows:
Tbe National War Labor Board * * * shall have the following [additional] powers and duties:
(1) Whenever the United States Conciliation Service * * * certifies that a labor dispute exists which may lead to substantial interference with the war effort, and cannot be settled by collective bargaining or conciliation, to summon both parties to such dispute before it and to conduct a public hearing on the merits of the dispute. * * * At such hearing both parties shall be given full notice and opportunity to be heard, but the failure of either party to appear shall not deprive the Board of jurisdiction to proceed to a hearing and order.
(2) To decide the dispute, and provide by order the wages and hours and all other terms and conditions (customarily included in collective-bargaining agreements) governing the relations between the parties, which shall be in effect until further order of the Board. * * * [T]he order of the Board shall provide for terms and conditions to govern relations between the parties which shall be fair and equitable to employer and employee under all the circumstances of the case.
(3) To require the attendance of witnesses and the production of such papers, documents, and records as may be material to its investigation of facts in any labor dispute, and to issue subpenas requiring such attendance or production.
48. (a) The Wage Adjustment Board was originally established to administer the wage stabilization agreement of May 22, 1942, between contracting agencies of the Federal Government, on the one hand, and labor unions operating in the building and construction industry, on the other hand. This agreement provided that, on war construction work done for or financed by the United States, the wage rates paid under collective-bargaining agreements as of July 1, 1942, should remain in effect for a period of at least 1 year after that date and, subject to annual renewal of the agreement of May 22,1942, for the duration of the war. However, it was further provided in the agreement that such rates might be revised in accordance with certain criteria set out in the agreement. The Wage Adjustment Board was created to pass on proposals for wage adjustments and to fix the amount of any adjustment that might be made.
*49 (b)An order issued by tbe National War Labor Board on October 13,1943, for tbe purpose of delegating certain of its functions to tbe Wage Adjustment Board provided in part as follows:
D. Tbe Wage Adjustment Board * * * shall * * * have jurisdiction over labor disputes and voluntary wage or salary adjustments involving persons employed in tbe building construction industry * * * who are not subject to tbe Wage Stabilization Agreement of May 22,1942. The Wage Adjustment Board shall have gower, subject to review by tbe National War Labor bard * * * (1) to hear and issue directive orders, in labor dispute cases, and (2) to make final rulings on voluntary wage and salary adjustments requiring tbe approval of the National War Labor Board.
E. The jurisdiction of tbe Wage Adjustment Board hereunder shall * * * be limited to mechanics and laborers in the building and construction industry employed directly upon the site of the work.
$ $ & sg: ‡
Gr. In the handling of dispute cases, the Wage Adjustment Board shall comply with all * * * pertinent rules of procedure of the National War Labor Board * * *.
(c)The procedural regulations of the National War Labor Board for the processing of dispute cases provided in part as follows:
If there is a strike or lockout when a case is certified to the Board * * *, the Strike Section of the Board, unless otherwise directed by the Board, shall notify the parties that the case is pending before the Board and that no action with respect to the merits of the dispute will be taken until the strike or lockout is discontinued.
(d)The only sanction available for use by the Government in the event of disobedience of a directive order issued by the Wage Adjustment Board was the seizure of the particular enterprise.
49. (a) The Employment Service was authorized and initially created under the Wagner-Peyser Act of June 6, 1933 (48 Stat. 113), to promote the establishment and maintenance of a coordinated system of State-operated public employment offices, with nationwide uniformity of basic employment policies and procedures effected through Federal supervision *50 of State operations. The Federal functions of the Employment Service were, for several years prior to World War II, under the jurisdiction of the Federal Security Agency; and State operation of the Employment Service was transferred to the Federal Security Agency as a part of the National Defense Mobilization Program in January 1942. Following the creation of the War Manpower Commission by Executive Order No. 9139 on April 18, 1942 (T F.E. 2919), the functions, personnel, and staff of the Federal Security Agency relating to employment, including the Employment Service, were transferred to the War Manpower Commission by Executive Order No. 9247 on September 17,1942 (7 F.K. 7379). The Employment Service offices thereafter functioned as operating arms of, and in accordance with basic national policies, programs, procedures, and operating directives of, the War Manpower Commission until the commission’s termination in 1945.
(b) In order to carry out the purposes for which the War Manpower Commission was established (i.e., the formulation and administration of plans, programs, and national policies which would assure the most effective mobilization and utilization of the Nation’s manpower in the prosecution of the war), a nationwide organization was established with the Chairman of the War Manpower Commission as its head and with its central office in Washington, D.C. Basic national policies, employment stabilization programs, procedures, regulations, and operating directives were there formulated, issued, and administered by the commission, with the advice and assistance of a national Management-Labor Committee. Decentralization of administration and operation, including the application and adaptation of basic national policies and programs to regional and local manpower requirements and problems, was effected through regional and area offices. Twelve regions were established, each of which was headed by a regional director appointed by the Chairman of the War Manpower Commission. The various regions included, at the local level, a number of areas headed by area directors, who reported to and operated under the regional director. Each regional and area director was responsible for the field *51 operation and administration of the manpower program in his region or area, including the local offices of the Employment Service, and each director'had the advice and assistance of a regional or area Management-Labor Committee.
(c) The Tulsa area included 13 counties in the northeastern section of the State of Oklahoma. All manpower activities and functions in this area, including those of the Employment Service, were under the supervision of the area director, located in Tulsa. The Tulsa area was a part of War Manpower Commission Region LX, which comprised all or portions of the States of Arkansas, Kansas, Missouri, and Oklahoma and was administered by a regional director located in Kansas City, Missouri.
50. (a) One of the fundamental and historical policies of the Employment Service was the maintenance of a position of absolute neutrality in labor dispute situations. To this end, the Employment Service neither participated in labor disputes nor referred workers to jobs affected by labor disputes. The War Manpower Commission, after it assumed control over the Employment Service, generally adopted and adhered to the same basic policy. However, the War Manpower Commission did provide for one exception, i.e., referrals could be made to an employer notwithstanding the existence of a labor dispute if the regional director determined that the making of such referrals was in the best interest of the war effort and then issued an appropriate directive to the Employment Service.
(b) The regulations implementing the policy referred to in paragraph (a) of this finding provided in part as follows:
3440 Policy Regarding Referrals to Jobs Vacant Because of a Labor Dispute: Local offices of the United States Employment Service shall make no referral, except in accordance with specific instructions to do so from the Regional Manpower Director, which will aid directly or indirectly in filling a job (a) which is vacant because the. former occupant is on strike or is being locked out in the course of a labor dispute or (b) the filling of which is an issue in a labor dispute.
The Regional Manpower Director may direct that referrals are to be made to such jobs if, after taking *52 the following steps, he determines that the making of such referrals is in the best interest of the war effort:
1. The Regional Manpower Director will request from a representative of the Government agency concerned with the adjustment of the labor dispute a statement as to whether that agency believes that the making of referrals to such jobs will interfere with negotiations or delay progress in the settlement of the dispute.
2. The Regional Manpower Director will submit to his Management-Labor Committee the information secured from the Government agency and other available information, and request the advice of the Management-Labor Committee as to the action which should be taken.
3. The Regional Manpower Director, after considering all the advice so secured, will determine whether the making of referrals is in the best interest of the war effort, and issue the proper instructions to the local offices concerned.
* * ¡s '* *
3442 Interpretation: The term “labor dispute” shall include any controversy concerning' terms or conditions of employment or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment regardless of whether or not the disputants stand in the proximate relation of employer and employee. The term includes any controversy between employers, or their representatives, and workers, or their representatives, or between groups of workers, or their representatives, concerning any of the following:
1. Negotiating, fixing, maintaining, changing, or arranging terms or conditions of employment;
2. The employment, non-employment, or tenure of employment of any individual or group of individuals;
3. The right of individuals or groups of individuals to be recognized as the representatives or bargaining agents of employers or workers.
H* «í» H* V
51. In the performance of all their construction contracts with the Federal Government during the World War II emergency period from July 16,1940, through the year 1945 (including the four levee contracts that are directly involved in the present proceedings), the plaintiffs realized a net profit of at least $160,000. This takes into account all of the Federal construction in which the plaintiffs participated as prime contractor, subcontractor, or joint venturer.

 The War Manpower Commission Rad adopted the “statement of availability” for employment as a device to promote stabilization of tbe working force in essential activities, and to restrict undue labor turnover and migration from one labor area to another. Such statements could be issued by former employers and by local offices of tbe Employment 'Service. Provisions governing their issuance were incorporated in tbe War Manpower Commission’s stabilization programs for the various regions and areas.

 As indicated in subsequent findings, the picket line was not effective to prevent the plaintiffs from resuming operations, and the picket line was withdrawn after about 10 days. However, the labor dispute notice of December 1, 1943, was never withdrawn.

 The communication of December 10, 1943, from the Office of the Chief of Engineers also stated that the refusal of the Employment Service to refer labor to the plaintiffs’ levee job was seriously interfering with the progress of the work. However, the evidence in the record does not support this statement relative to serious interference with the progress of the work as of December 10, 1943. (See finding 20.)

 The picket line was withdrawn, but not because of this telegram. See footnote 2.

 Pertinent provisions of tie Executive order and statute are set out in findings 46 and 47.